John **RENNER**, M.D., Plaintiff,

v.

Kurt **DONSBACH**, et al., Defendants.

No. 88–0838–CV–W–9.

United States District Court,
W.D. Missouri, W.D.

Oct. 8, 1990.

Michael K. Botts, Kansas City, Mo., for plaintiff.

Ronald C. Nesmith, Dilling & Dilling, Chicago, Ill., for Kurt Donsbach, Int'l Inst. of Natur and Peter Joseph Lisa.

George A. Tyree, Edwards, Tyree & Martin, Blue Springs, Mo., for Clinton Miller, Nat'l Health Federat and Maureen Salaman.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BARTLETT, District Judge.

Plaintiff John Renner, M.D. (Renner), brings this action against four individuals, Kurt Donsbach (Donsbach), Peter Joseph Lisa (Lisa), Maureen Salaman (Salaman) and Clinton Miller (Miller). Additionally, plaintiff brings this action against International Institute of Natural Health Sciences, Inc. (IINHS) and National Health Federation (NHF). Plaintiff brings his action in four counts: 1) a claim of defamation based upon a) a paragraph contained in a book entitled *The Great Monopoly Wars* written by Lisa and b) a portion of a speech delivered by Salaman at a regional convention of NHF held in Kansas City, Missouri; 2) a claim of invasion of privacy because the two allegedly defamatory statements forming the basis of Count I for defamation placed plaintiff in an objectionable false light before the public; 3) a claim for continuing conspiracy to defame; and 4) a claim for continuing conspiracy to place plaintiff in an objectionable false light before the public.

Defendants have filed a Motion for Summary Judgment. The thrust of defendants' argument is that the two statements alleged to be defamatory are not defamatory as a matter of law.

## I. *Undisputed Facts*

Kurt Donsbach was Chairman of the Board of NHF. Salaman is the NHF president and Miller is the Washington, D.C. legislative advocate for NHF. Lisa authored *The Great Medical Monopoly Wars*. At one time, Donsbach was president of IINHS.

According to Miller, some of the activities of NHF include working on legislative matters having to do with the environment and on food and drug issues intended to improve the public health and advocating "health freedom." Miller described health freedom as the "right to take care of one's body; to choose one's own health practitioner; to use the therapist of one's own choice; to be able to have a choice of alternative approaches to health; and to be able to buy foods for their therapeutic value." Miller depo. at 135–36.

Salaman testified that she experiences health freedom by being involved with nutrition and natural healing modalities. Salaman stated that she sees Renner as a representative of the "medical establishment." Salaman testified that those supportive of her position and those supportive of Renner's philosophy are engaged in a "war of two etiologies." Salaman depo. at 77–78. In her deposition on May 17, 1989, Salaman testified as follows:

Q. You testified numerous times that Dr. Renner is aligned with certain modalities or with the—

A. With drug therapies.

Q. With drug therapies and that his organizations and who he represents as a public figure are contrary to the modalities that you support?

A. That's right.

Salaman depo. at 217.

In his Complaint, plaintiff states that he is a licensed medical doctor employed by Trinity Lutheran Hospital, Kansas City, Missouri, as the Director of Medical Development, Director of the National Family Practice Research and Development Center, and as a clinical professor of family medicine at the University of Missouri at Kansas City. Complaint at ¶ 4. Renner asserts that he is a well-respected scholar,

author, lecturer, professor of family medicine and consultant in the areas of family practice and health and nutrition fraud. Complaint at ¶ 6. Renner is an author of both scholarly and general distribution journal articles in the areas of family practice and health and nutrition fraud. Renner is the author of a weekly newspaper column on health and nutrition. Complaint at ¶ 7. Plaintiff has also appeared from time to time on television, including a nationally broadcast edition of "20/20." Renner depo. at 40–41, 62.

## II. *Standard for Summary Judgment*

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States*, 600 F.2d 725, 727–28 (8th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). *See also City of Mt. Pleasant v. Associated Electric Cooperative, Inc.*, 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for

trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 106 S.Ct. at 2553.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the *absence* of genuine issues of material fact. However, the moving party *is not required* to support its motion with affidavits or other similar materials *negating* the opponent's claim. *Id.* (emphasis added).

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in his pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

The inquiry to be made mirrors the standard for a directed verdict: whether the evidence presented by the party with the onus of proof is sufficient that a jury could properly proceed to return a verdict for that party. *Id.* Essentially, the question in ruling on a motion for summary judgment and on a motion for directed verdict is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law. *Id.* 106 S.Ct. at 2512.

### III. *Discussion*

### A. *Defamation*

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), the Court held:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

In *Curtis Publishing Co. v. Butts* and its companion *Associated Press v. Walker,* 388 U.S. 130, 162, 87 S.Ct.1975, 1995, 18 L.Ed.2d 1094 (1967), the Court concluded that the *New York Times* test should apply to criticism of "public figures" as well as "public officials." Public figures were described as non-public persons who are "nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id.* 388 U.S. at 164, 87 S.Ct. at 1996.

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court concluded that the designation of "public figure" could rest on either of two alternative bases:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of the questions.

*Id.* 94 S.Ct. at 3013.

In *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), the Court said:

> The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are 'intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.' *Associated Press v. Walker,* decided with *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in result). Justice Frankfurter put it succinctly in *Baumgartner v. United States,* 322 U.S. 665, 673–74, 64 S.Ct. 1240, 145, 88 L.Ed. 1525 (1944), when he said that '[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures.' Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to 'vehement, caustic, and sometimes unpleasantly sharp attacks,' *New York Times, supra,* 376 U.S. at 270, 84 S.Ct. at 721. '[T]he candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate to the contrary.' *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 274, 91 S.Ct. 621, 626, 28 L.Ed.2d 35 (1971).

Of course, this does not mean that *any* speech about a public figure is immune from sanction in the form of damages. Since *New York Times Co. v. Sullivan, supra,* we have consistently ruled that a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood, but only if the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' *Id.,* 376 U.S. at 279–80, 84 S.Ct. at 726. False statements of fact are particularly valueless; they interfere with the truth speaking function of the market place of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counter speech, however persuasive or effective. *See Gertz,* 418 U.S. at 340, 344 n. 9, 94 S.Ct. at 3007, 3009 n. 9. But even though falsehoods have little value in and of

themselves, they are 'nevertheless inevitable in free debate,' *id.* at 340, 94 S.Ct. at 3007, and a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted 'chilling' effect on speech relating to public figures that does have constitutional value. 'Freedoms of expression require "breathing space." ' *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 772, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783 (1986) (quoting *New York Times,* 376 U.S. at 272, 84 S.Ct. at 721). This breathing space is provided by a constitutional rule that allows public figures to recover for libel or defamation *only when they can prove both that the statement was false and that the statement was made with the requisite level of culpability.*

*Id.* 108 S.Ct. at 879–80 (emphasis added).

■ In order for a public figure to recover for defamation, the public figure must show actual malice "with convincing clarity." *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 728–29; *Curtis Publishing Co. v. Butts, supra.*

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 244, 106 S.Ct. 2505, 2508, 91 L.Ed.2d 202 (1986), the Supreme Court was presented with the question of "whether the clear and convincing evidence requirement must be considered by a court ruling on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, in a case to which *New York Times Co.* applies."

Just as the 'convincing clarity' requirement is relevant in ruling on a motion for directed verdict, it is relevant in ruling on a motion for summary judgment. When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* For example, there is no genuine issue if the evidence presented in the opposing affidavit is of insufficient caliber or quantity to allow a rational finder of fact to find

actual malice by clear and convincing evidence.

. . . . .

In sum, a court ruling on a motion for summary judgment must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence is such that a reasonable jury might find that actual malice had been shown with convincing clarity.

*Id.* 106 S.Ct. at 2513, 2514–15.

### 1. *Public Figure*

■ Based on the undisputed facts, Renner was a public figure for a limited range of issues involving health and nutrition fraud. Renner has written extensively in this area as a newspaper columnist and author of various journal articles. He has also appeared on at least one nationally broadcast television program discussing health and nutrition issues. Furthermore, plaintiff does not dispute that he is a public figure with respect to the particular controversy giving rise to the two alleged defamatory statements. In a hearing before United States Magistrate William A. Knox regarding a discovery dispute, plaintiff's counsel stated: "I have a very high standard to meet in that Dr. Renner is a public figure. I've got to prove constitutional malice." Later in the same conference, plaintiff's counsel stated "Dr. Renner made himself a public figure in 1984 and late '84, '85, and Lisa was put on him right in 1984, as soon as he became a public figure." Transcript of August 17, 1989, hearing at 131.

Thus, because plaintiff is a public figure, the *New York Times* actual malice standard is applicable in this case and the clear and convincing evidentiary standard must be used in determining whether there is a genuine issue of fact on actual malice, i.e., whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.

### 2. *The Lisa Book*

■ Plaintiff contends that the following paragraph found at page 30 of Lisa's book, *The Great Medical Monopoly Wars,* is defamatory:

This firm also represented St. Mary's and John Renner in a lawsuit filed by another medical doctor in 1982 filed in the Circuit Court of Jackson County, Missouri. (In that case, family members of a patient who died at St. Mary's charged their father's death to Renner and others. The details show that the family felt there was a direct cause and effect with Renner being responsible to some extent.)

In his affidavit, Lisa states that he spent a substantial amount of time researching and writing the book, including "research of the court records of the Circuit Court of Jackson County, Missouri, in the case of *Leo M. Mullen, M.D. v. John H. Renner, et al.,* case number CV–83–22766." Affidavit at ¶ 2. Lisa attaches a copy of the Petition filed in that case.

In the Petition, Mullen states in pertinent part:

Comes now Leo M. Mullen, M.D., a practicing physician, and for his cause of action states:

(1) Defendant John H. Renner moved recently to Kansas City, Mo. and on or about March of 1982 decided to take over the hospital patients of the plaintiff stating that the bylaws gave him said right. He put together a committee of two other doctors, one of which was not a member of St. Mary's staff, even though the bylaws provided that those on the committee be staff members. Acting in violation of the bylaws he also appointed an associate of his knowing that such members were bound to him and would decide exactly as he wished them to. This also violated the bylaws. With part of his people appointed, he also brought in the Gerald B. Lee Corp. who were to be his servants and while suspending the privileges of the plaintiff took over and ordered his servants, Dr. Lee and Ritter to move in without notification to the plaintiff. All of this in violation of medical ethics. Acting with the administrator and the BD. of Directors, new orders were written to repeat lab work and x-rays that had been done all for the profit of the pathology group and the radiological group. In spite of attempts to remove the patient to another hospital the doctors now involved convinced the family of the patient that he was too ill to be moved because the new medicine had caused the patient to get worse. However, after several days the patient was dismissed and later admitted again becasuse [sic] of a collapse in a parking lot close to St. Mary's Hospital. The plaintiff was not notified of this admission and has never been consulted by Dr. Renner, Dr. Zoller of the pathological group or by Dr. Lee and Ritter. No reports of the patient have been sent by the radiological group. The [patient] finally brought to the office by the plaintiff but now was beyond help and died within 36 hours. All of this in violation of bylaws and violation of medical ethics as outlined by the AM[A].

Mullen asked the court to render judgment against all defendants for actual and punitive damages and requested an audit be conducted with respect to patients allegedly "taken over" by defendants so that Mullen could be properly compensated. Mullen also requested a restraining order so that he could take care of those patients who were "being placed in the hands of those who were violating the bylaws." However, apparently, *Mullen v. Renner* was dismissed by the trial court for failure to state a cause of action before the Lisa book was written.

Also attached to Lisa's affidavit was a copy of a letter from Lavon Marie Ingraham, a daughter of the patient referred to in the paragraph from Lisa's book Lisa states was in the *Mullen* court file.

To whom it may concern, re: Gordon M. Ingraham.

In March of '82 my father was admitted to the hospital by Dr. Leo M. Mullen. My father was doing well under Dr. Mullen's care, and without our knowledge other doctors took over his case. New

medicine was given that made him be upset and confused. After several tests they dismissed him, then a short while later he collapsed again.

On October 13, 1982, we returned to Dr. Mullen. By this time his case was hopeless. He died 36 hours later.

I believe that the hospital was wrong by dismissing Dr. Mullen from his case and assigning other doctors without our knowledge and consent.

Appendix B to Lisa affidavit.

Defendants argue that Lisa's statements at page 30 of his book were not made "with actual malice" because Lisa's report of the Mullen case was not false. Plaintiff argues that Lisa's statements are false. Renner states in his affidavit, "I have never been sued or charged by anyone relating to the death of any patient or anyone, either while at St. Mary's Hospital or any where else." Affidavit at ¶ 2.

A reasonable jury could conclude that the summary in the Lisa book of the *Mullen* case was false because the words "in that case" can easily be read as "in that lawsuit." Family members of the patient were not parties to the *Mullen* suit. The family members did not charge Renner with "their father's death in that case."

In addition, there is a genuine issue for trial on whether the challenged portion of the Lisa book was published with knowledge that it was false or "with reckless disregard of whether it was false or not." For instance, plaintiff has presented facts that support the conclusion that defendants perceived that they were at "war" with plaintiff and others sharing plaintiff's viewpoint. A reasonable jury could conclude that defendants repeated whatever negative they heard about plaintiff in the most derogatory light possible without checking the accuracy of the facts or the inferences that they were drawing from the facts. The statement about the *Mullen* suit in Lisa's book is an example.

A reasonable juror could conclude that the statement in the Lisa book was made with reckless disregard for whether it was false or not if the juror believed facts presented by plaintiff in opposition to the

motion and if the juror chose to draw certain inferences from those facts about defendants' mental state. For instance, a reasonable juror could conclude that defendants considered a plan to destroy plaintiff's credit by presenting information about plaintiff's credit in a false manner. According to a memorandum from Lisa presented by plaintiff in opposition to the motion, Lisa proposed assembling information about plaintiff's credit and then presenting it to various credit reporting companies "in a form that they can use and which does not reflect the source, other than someone who Renner owes money to and did not pay." The "effect" of this plan would be "a worsened credit rating" for Renner and "creditors pressuring him on his current bills and possibly being dropped as a client due to the fact that his credit is so poor." If the jury believed that defendants' mental attitude about. plaintiff was that anything goes to silence his criticism regardless of its truth, the jury might conclude that not only was the Lisa statement about the Mullen case false, but it was made with reckless disregard to whether or not it was true.

### 3. *Salaman's Statements*

■ Plaintiff contends that the following statements made by Salaman on June 4, 1988, at a National Health Federation gathering are defamatory:

Renner, Dr. Renner, who would destroy your freedom of choice is outside listening to me on a tape. He doesn't have the courage to come in and face you; he doesn't have the courage to come in and tell you that he's out to take your freedom to choose. Come on in, Dr. Renner, you hear my voice because I am going right out there to get you as soon as I get off this platform. And, well, some people may think I'm diplomatic, I think you are a scumbag, and the hottest place in hell is not good enough for you. I hope you burn for eternity in hell for your acts. Because the Bible says, 'Be not dismayed for the Lord is not mocked for as a man reaps so shall he sow.' And you belong in the hottest place in hell, and you're going to end up there. Now

come on up here and challenge me if you dare.

Don't be such a coward, hiding behind the millions that are behind you, hiding behind a medical establishment that is murdering people. You are no better than a murderer.

Complaint at ¶ 55.

Although plaintiff does not contend that any further statements made by Salaman are defamatory, it is useful to set forth further statements made by Salaman during the speech in which she made the allegedly defamatory remarks in order to place those remarks in context. Apparently, directly after Salaman made the alleged defamatory remarks, she continued as follows:

You [Dr. Renner] have been treated at this convention with courtesy. You have been treated by wonderful people who want to return to natural means of healing, who want to heal this nation. You've been treated with courtesy. Well that's ending right here because when our people went to your convention you threw them out. Your friend Victor Herbert has actually assaulted some of our people who dared to object to the fact that he called our healing quackery. That was in Iowa. Have your [sic] not all heard of Frank Wiewel and his problems with Victor Herbert. He sat in the audience courteously, and taped what Victor Herbert had to say. Victor Herbert got down off the podium, leapt over four aisles, assaulted him, took his tape recorder, ripped the satchel off his arm and assaulted him. And they went before the courts and the judge said it was all right. He has turned the law statutes in—Clinton, it's Iowa, isn't it—is it Iowa or Idaho, Clinton? It's Iowa, upside become its legal to assault anybody because of the precedent that Victor Herbert started.

Now Dr. Renner, why do you stand there, in the back of the room. Why don't you tell these people that you want to take their freedom to choose to hear this message. What is your beef with us? That's right, one of the audience is asking, what's your beef with us? Then

get out! Then get out! I'm telling you to, you get out and stay out, and I never want to see your ugly face again....

Exhibit B to Salaman affidavit.

Defendants contend that Salaman's statements are not defamatory because they are expressions of opinion and commentary and are not statements of fact.

In *Gertz v. Welch*, 418 U.S. at 339, 94 S.Ct. at 3007, the Court held that plaintiff must show that the defamatory falsehood was a false statement of fact opposed to pure comment or opinion: "We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on competition of other ideas." In *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a newspaper reported that some persons at a public meeting concerning the city's dealings with a real estate developer had characterized the developer's behavior as "blackmail." The plaintiff complained that the newspaper's use of the term "blackmail" was defamatory arguing that the newspaper knew that the developer had committed no such crime and that use of the phrase constituted an intentional and knowing use of a falsehood. The Court rejected plaintiff's claim holding "that as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported...." *Id.* at 1541. The Court further explained:

It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: It was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyper-

bole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable....

*Id.* at 1542.

Salaman's statements, like those who charged Bresler with blackmail in *Greenbelt*, are nothing more than rhetorical hyperbole and vigorous epithets. Salaman obviously disagrees with whatever philosophy she considers Renner to represent. Her statement that Renner is *"no better than* a murderer" came right after she charged that Renner is hiding behind a "medical establishment that is murdering people." Apparently, Salaman considered Renner to be part of a group that engaged in activities that she believed would lead to the death of innocent people. However, these statements do not directly charge Renner with the commission of a crime.

Therefore, Renner has failed to establish that a jury could find that there was clear and convincing evidence that Salaman's statements were statements of fact made with actual malice rather than comment or opinion. Accordingly, summary judgment will be granted in favor of defendants in connection with Salaman's allegedly defamatory statements.

### B. "Sham Corporations"

Defendants seek judgment in their favor as a matter of law "as to the charges that the corporate defendants are sham corporations, organized and operated to accomplish illegal purposes." Although defendants offer facts suggesting that neither corporate defendant (International Institute of Health Services, Inc. and National Health Federation) has ever been convicted of a crime, defendants furnish no legal authority establishing the standards for determining whether a corporation is a "sham corporation."

Plaintiff responds with facts suggesting that the assets of the two corporations may have been used for the personal benefit of officers and shareholders. Plaintiff provides no legal authority stating what he must show to establish that the defendant corporations are "sham corporations organized and operated to accomplish illegal purposes ..." and that "the officers and

directors thereof [be] held personally liable, jointly and severally, for any and all damages caused to Dr. Renner." Complaint at ¶¶ 20, 21, 26, 27.

Accordingly, defendants' Motion for Summary Judgment on the issue of whether the corporate veil can be pierced as to either corporation will be denied. Defendants have not convinced me that they are entitled to judgment on this issue as a matter of law.

### C. Conspiracy to Defame

Plaintiff alleges in his Complaint that "the individual defendants have conspired and continue to conspire among and between each other to damage the business, trade and professional reputation of Dr. Renner." Complaint at ¶ 64. In the next paragraph, plaintiff alleges that "the individual defendants have conspired and continue to conspire among and between themselves to damage the personal reputation of Dr. Renner."

Defendants assert that "the Petition is not legally sufficient to set forth a claim for conspiracy." Defendants rely on *Manis v. Sterling,* 862 F.2d 679 (8th Cir.1988), where the court stated:

> Allegations of conspiracy, however, must be pled with sufficient specificity and factual support to suggest a 'meeting of the minds.' ...

> Because Manis has not pled facts which, if assumed true, would support an inference that the alleged conspirators had reached a 'meeting of the minds,' the District Court properly dismissed Manis's claims.

*Id.* at 681.

Plaintiff ignores defendants' challenge to the sufficiency of the Complaint. In his response, plaintiff refers to facts outside the pleadings. In response, defendants primarily rely on the magistrate's recommendation in an Iowa case and on the plaintiff's conclusion about this case that "the record is totally devoid of any evidence of an unlawful agreement of conspiracy among the defendants."

Whether defendants' motion is taken as a Motion to Dismiss or as a Motion for Sum-

mary Judgment, defendants have not persuaded me that they are entitled to judgment as a matter of law on plaintiff's conspiracy claim as it relates only to the Lisa book.

If defendants' motion is viewed as a Motion to Dismiss (as originally intended), the facts alleged in the Complaint must be taken as true. If this is done, a reasonable inference can be drawn that the individual defendants reached a meeting of the minds to obtain, promote and distribute the Lisa book.

On the other hand, if viewed as a Motion for Summary Judgment, the facts presented by plaintiff must be viewed in the light most favorable to plaintiff and plaintiff must be afforded all reasonable inferences to be drawn from the evidence. If all of the facts presented by plaintiff are taken into consideration and not just those that plaintiff refers to in the section specifically responding to defendants' challenge to the conspiracy claim, I do not believe that defendants have established that there is no genuine issue for trial on plaintiff's conspiracy claim as it relates to the production, promotion and distribution of the Lisa book.

### D. False Light Tort

■ In plaintiff's second claim against defendants, plaintiff alleges in ¶ 60 of his Complaint that "Defendant's [sic] have published false statements, of and concerning Dr. Renner, which places Dr. Renner in an objectionable false light before the public." Defendants seek summary judgment in their favor "as to the charges placing plaintiff in an objectional false light before the public."

Defendants make no argument in support of this part of their request for summary judgment. Plaintiff responds to defendants' request for summary judgment on the false light claim by stating that "the false light of the defendants' statements has been previously established by the evidence relating to the defamation." Plaintiff argues that Missouri recognized "the tort of false light" in *Buller v. Pulitzer Publishing Co.*, 684 S.W.2d 473, 483 (Mo. App.1984).

In *Buller*, the Court of Appeals suggested that an action for a "false light" invasion would lie but that plaintiff failed to properly plead such an action. *See Sullivan v. Pulitzer Broadcasting Co.*, 709 S.W.2d 475, 478 (Mo. banc 1986).

In *Sullivan*, the Missouri Supreme Court stated that "[t]his court, however, has not yet recognized a cause of action apart from defamation for a 'false light' invasion of privacy...." Referring to *Buller*, the court stated that the cause of action involved in that case was not false light invasion of privacy but "public disclosure of private facts." In *Sullivan*, the Supreme Court refused "to decide whether or not to demonstrate a separate tort for 'false light invasion of privacy.'" *Id.* at 481.

> This Court is not confronted with a situation where a party alleges that another has created a false impression in the public eye. Nor is this a case such as *Crump [v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (W.Va.1984) ] supra, where the plaintiff's likeness (picture) improperly created the impression that the plaintiff encountered the problems discussed in the story. The case at bar is nothing more than the classic defamation action where one party alleges that the other published a false accusation concerning a statement of fact—in this case, a charge of criminal conduct or wrongdoing.

*Id.*

The instant case presents a fact situation closer to *Sullivan* than to the classic tort for false light invasion of privacy. Accordingly, I do not believe that the Missouri Supreme Court, if presented with this case, would recognize a separate tort for false light invasion of privacy when the defamation claim asserted is adequate to afford relief if plaintiff is entitled to it. *See Henry v. Taft Television & Radio Co.*, 774 S.W.2d 889 (Mo.App.1989) (where the claim for recovery "involves untrue statements, the appropriate remedy is by defamation"); *Shuron v. Montelone*, 769 S.W.2d 188 (Mo. App.1989) (remedy in tort for publication of untrue statements was governed by law of

defamation, not false light invasion of privacy).

Accordingly, plaintiff's claim for false light invasion of privacy and his claim for conspiracy to place plaintiff in an objectionable false light will be dismissed for failure to state claims for relief.

### IV. *Conclusion*

Accordingly, it is hereby ORDERED that:

1) defendants' Motion for Summary Judgment directed to plaintiff's defamation claim is granted in part (the Salaman statements) and denied in part (the Lisa book);

2) defendants' Motion for Summary Judgment on the issue of piercing the corporate veil is denied;

3) defendants' Motion to Dismiss or for Summary Judgment on the conspiracy to defame claim is granted in part (the Salaman statements) and denied in part (the Lisa book); and

4) defendants' Motion for Summary Judgment on the claim for false light invasion of privacy and conspiracy to place plaintiff in an objectinable false light is granted.