# GREENBELT COOPERATIVE PUBLISHING ASSN., INC., ET AL. *v.* BRESLER

No. 413.   Argued February 24–25, 1970—
Decided May 18, 1970

*Roger A. Clark* argued the cause and filed briefs for petitioners.

*Abraham Chasanow* argued the cause for respondent. With him on the brief was *Howard S. Chasanow.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioners are the publishers of a small weekly newspaper, the Greenbelt News Review, in the city of Greenbelt, Maryland. The respondent Bresler is a prominent local real estate developer and builder in Greenbelt, and was, during the period in question, a member of the Maryland House of Delegates from a neighboring district. In the autumn of 1965 Bresler was engaged in negotiations with the Greenbelt City Council to obtain certain zoning variances that would allow the construction of high-density housing on land owned by him. At the same time the city was attempting to acquire another tract of land owned by Bresler for the construction of a new high school. Extensive litigation concerning compensation for the school site seemed imminent, unless there should be an agreement on its price between Bresler and the city authorities, and the concurrent negotiations obviously provided both parties considerable bargaining leverage.

These joint negotiations evoked substantial local controversy, and several tumultuous city council meetings were held at which many members of the community freely expressed their views. The meetings were reported at length in the news columns of the Greenbelt News Review. Two news articles in consecutive weekly editions of the paper stated that at the public meetings some people had characterized Bresler's negotiating position as "blackmail." The word appeared several times,

8

both with and without quotation marks, and was used once as a subheading within a news story.[1]

Bresler reacted to these news articles by filing the present lawsuit for libel, seeking both compensatory and punitive damages. The primary thrust of his complaint was that the articles, individually and along with other items published in the petitioners' newspaper, imputed to him the crime of blackmail. The case went to trial, and the jury awarded Bresler $5,000 in compensatory damages and $12,500 in punitive damages. The Maryland Court of Appeals affirmed the judgment. 253 Md. 324, 252 A. 2d 755. We granted certiorari to consider the constitutional issues presented. 396 U. S. 874.

In *New York Times Co.* v. *Sullivan,* 376 U. S. 254, we held that the Constitution permits a "public official" to recover money damages for libel only if he can show that the defamatory publication was not only false but was uttered with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* at 280. In *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, we dealt with the constitutional restrictions upon a libel suit brought by a "public figure."

In the present case Bresler's counsel conceded in his opening statement to the jury that Bresler was a public figure in the community. This concession was clearly correct. Bresler was deeply involved in the future development of the city of Greenbelt. He had entered into agreements with the city for zoning variances in the past, and was again seeking such favors to permit the construction of housing units of a type not contemplated in the original city plan. At the same time the city was trying to obtain a tract of land owned by Bresler for the purpose

---

[1] The relevant portions of these news articles are printed as an appendix to this opinion.

of building a school. Negotiations of significant public concern were in progress, both with school officials and the city council. Bresler's status thus clearly fell within even the most restrictive definition of a "public figure." *Curtis Publishing Co.* v. *Butts, supra,* at 154–155 (opinion of HARLAN, J.). See also *Pauling* v. *Globe-Democrat Publishing Co.,* 362 F. 2d 188, 195–196, cert. denied, 388 U. S. 909.

Whether as a state legislator representing another county, or for some other reason, Bresler was a "public official" within the meaning of the *New York Times* rule is a question we need not determine. Cf. *Time, Inc.* v. *Hill,* 385 U. S. 374, 390; *Rosenblatt* v. *Baer,* 383 U. S. 75, 86 n. 12. For the instructions to the jury in this case permitted a finding of liability under an impermissible constitutional standard, whichever status Bresler might be considered to occupy. In his charge to the members of the jury, the trial judge repeatedly instructed them that Bresler could recover if the petitioners' publications had been made with malice *or* with a reckless disregard of whether they were true or false. This instruction was given in one form or another half a dozen times during the course of the judge's charge.[2]

---

[2] The following excerpts from the trial judge's charge are illustrative:

"Accordingly . . . you must find for the defendant on the issue of fair comment, unless you determine by a preponderance of the evidence that the comment or criticism . . . was published with malice or a reckless disregard of whether it was true or false.

". . . And such statements repeated and/or published, unless with actual malice, or knowledge that they are false, reckless disregard for whether they are true or false, is not libel.

"The law recognizes the importance of free discussion and criticism and matters of public interest to the extent that it grants immunity even with respect to the publication of foolish and prejudicial criticism if they are not published with malice, knowledge

The judge then defined "malice" to include "spite, hostility or deliberate intention to harm." Moreover, he instructed the jury that "malice" could be found from the "language" of the publication itself.[3] Thus the jury was permitted to find liability merely on the basis of a combination of falsehood and general hostility.

This was error of constitutional magnitude, as our decisions have made clear. "This definition of malice is constitutionally insufficient where discussion of public affairs is concerned; '[w]e held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true.'" *Rosenblatt* v. *Baer, supra,* at 84. "[E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it

of their not being true, it is knowledge they are false, or reckless disregard of whether they are true or false. . . .

    .       .       .       .       .

"[Y]our verdict should be for the defendant unless you find that the publication was made with actual malice, knowledge of its falsity, or reckless disregard of whether it was true or false.

    .       .       .       .       .

"[Y]our verdict should be for the defendant unless you find again the publication was with actual malice, knowledge of its being false or reckless disregard of whether it was true or false."

[3] The trial judge said:

"With respect to your consideration of presence of actual malice on the part of defendant, you may infer its presence from the language or circumstances of the publication, but this may be done only if the character of the publication is so excessive, intemperate, unreasonable and abusive as to defy any other reasonable conclusion than that the defendant was moved by actual malice toward the plaintiff."

will be proved in court that he spoke out of hatred . . . ." *Garrison* v. *Louisiana,* 379 U. S. 64, 73. See also *Beckley Newspapers Corp.* v. *Hanks,* 389 U. S. 81, 82. And the constitutional prohibition in this respect is no different whether the plaintiff be considered a "public official" or a "public figure." *Curtis Publishing Co.* v. *Butts, supra.*

The erroneous instructions to the jury would, therefore, alone be enough to require the reversal of the judgment before us. For when "it is impossible to know, in view of the general verdict returned" whether the jury imposed liability on a permissible or an impermissible ground, "the judgment must be reversed and the case remanded." *New York Times Co.* v. *Sullivan, supra,* at 284. See *Time, Inc.* v. *Hill, supra,* at 394–397; *Rosenblatt* v. *Baer, supra,* at 82; *Stromberg* v. *California,* 283 U. S. 359, 367–368.

This, however, does not end the inquiry. As we noted in *New York Times,* "[t]his Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . We must 'make an independent examination of the whole record,' . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." 376 U. S., at 285.

This case involves newspaper reports of public meetings of the citizens of a community concerned with matters of local governmental interest and importance. The very subject matter of the news reports, therefore, is one of particular First Amendment concern. "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means . . . is a fundamental principle of our constitutional system." *Stromberg* v. *Cali-*

*fornia, supra,* at 369. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama,* 310 U. S. 88, 102.[4] Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability.[5]

It is not disputed that the articles published in the petitioners' newspaper were accurate and truthful reports of what had been said at the public hearings before the city council.[6] In this sense, therefore, it cannot even be claimed that the petitioners were guilty of any "departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers," *Curtis Publishing Co.* v. *Butts, supra,* at 155 (opinion of HARLAN, J.), much less the knowing use of falsehood or a

---

[4] See also Note, The Scope of First Amendment Protection for Good-Faith Defamatory Error, 75 Yale L. J. 642, 644–645; Pedrick, Freedom of the Press and the Law of Libel: The Modern Revised Translation, 49 Cornell L. Q. 581, 592–593.

[5] Cf. *Pauling* v. *Globe-Democrat Publishing Co.,* 362 F. 2d 188, cert. denied, 388 U. S. 909; Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment," 1964 Sup. Ct. Rev. 191, 221.

[6] The mayor of the city testified, "Certainly nothing in here that reports the meeting any different from the way it happened. This is pretty much the way it happened. If I would say anything, it is rather conservative in presenting some of the comments."

The reporter who wrote one of the articles testified: "[T]he people were really mad and that word 'blackmail' was used not once or twice like in my story, but over and over and over again.

"Q. By who?

"A. By people at the meeting. And I felt if I left that out I really wouldn't be writing a truthful article."

reckless disregard of whether the statements made were true or false. *New York Times Co.* v. *Sullivan, supra,* at 280.

The contention is, rather, that the speakers at the meeting, in using the word "blackmail," and the petitioners in reporting the use of that word in the newspaper articles, were charging Bresler with the crime of blackmail, and that since the petitioners knew that Bresler had committed no such crime, they could be held liable for the knowing use of falsehood. It was upon this theory that the case was submitted to the jury, and upon this theory that the judgment was affirmed by the Maryland Court of Appeals. 253 Md. 324, 360–364, 252 A. 2d 755, 775–778. For the reasons that follow, we hold that the imposition of liability on such a basis was constitutionally impermissible—that as a matter of constitutional law, the word "blackmail" in these circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review.

There can be no question that the public debates at the sessions of the city council regarding Bresler's negotiations with the city were a subject of substantial concern to all who lived in the community. The debates themselves were heated, as debates about controversial issues usually are. During the course of the arguments Bresler's opponents characterized the position he had taken in his negotiations with the city officials as "blackmail." The Greenbelt News Review was performing its wholly legitimate function as a community newspaper when it published full reports of these public debates in its news columns. If the reports had been truncated or distorted in such a way as to extract the word "blackmail" from the context in which it was used at the public meetings, this would be a different case. But the reports were accurate and full. Their headlines, "School

14

Site Stirs Up Council—Rezoning Deal Offer Debated"
and "Council Rejects By 4–1 High School Site Deal,"
made it clear to all readers that the paper was reporting
the public debates on the pending land negotiations.
Bresler's proposal was accurately and fully described in
each article, along with the accurate statement that some
people at the meetings had referred to the proposal as
blackmail, and others had indicated they thought Bres-
ler's position not unreasonable.

It is simply impossible to believe that a reader who
reached the word "blackmail" in either article would
not have understood exactly what was meant: it was
Bresler's public and wholly legal negotiating proposals
that were being criticized. No reader could have thought
that either the speakers at the meetings or the newspaper
articles reporting their words were charging Bresler with
the commission of a criminal offense.[7] On the contrary,
even the most careless reader must have perceived that
the word was no more than rhetorical hyperbole, a vig-
orous epithet used by those who considered Bresler's
negotiating position extremely unreasonable. Indeed,
the record is completely devoid of evidence that anyone
in the city of Greenbelt or anywhere else thought Bresler
had been charged with a crime.

To permit the infliction of financial liability upon the
petitioners for publishing these two news articles would
subvert the most fundamental meaning of a free press,
protected by the First and Fourteenth Amendments.

---

[7] Under the law of Maryland the crime of blackmail consists in
threatening to accuse any person of an indictable crime or of any-
thing which, if true, would bring the person into contempt or
disrepute, with a view to extorting money, goods, or things of value.
See Md. Ann. Code, Art. 27, §§ 561–563 (1967 Repl. Vol.). There
is, of course, no indication in any of the articles that Bresler had
engaged in anything approaching such conduct.

Accordingly, we reverse the judgment and remand the case to the Court of Appeals of Maryland for further proceedings not inconsistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

On October 14, 1965, the following story appeared in the Greenbelt News Review:

### SCHOOL SITE STIRS UP COUNCIL REZONING DEAL OFFER DEBATED

By Dorothy Sucher

Delay in construction of a new Greenbelt high school is the lever by which a local developer is pressuring the city to endorse his bid for higher density rezoning of two large tracts of land; so citizens heard at a well-attended special meeting of the City Council on Monday night, Oct. 11.

For the past nine months, the Board of Education has been trying to acquire land owned by Consolidated Syndicates, Inc. (Charles Bresler-Theodore Lerner), for a high school site. The landowners, developers of Charlestowne Village, also own other tracts of undeveloped land in Greenbelt.

The developer has refused to accept the Board of Education's price, and condemnation proceedings have already been delayed three times . . . . Originally, it was hoped the new school would open September 1966.

Some time ago, it became known that the developer would agree on the price, provided the city would help him obtain higher density rezoning for two of his tracts (Parcels 1 and 2, totaling 230 acres) near the center of Greenbelt. If the city refused, he threatened to delay

the school site acquisition as long as possible through the courts.

This "deal" as it was termed by several citizens at Monday's meeting, has been rumored for months, but only became public knowledge recently. It was categorically opposed by Nathan Shinderman, a Board member of Greenbelt Homes, Inc. (GHI), who read a lengthy statement by GHI president Charles Schwan . . . .

## Blackmail

"It seems that this is a slight case of blackmail," commented Mrs. Marjorie Bergemann on Monday night, and the word was echoed by many speakers from the audience.

Councilman David Champion, however, denied that it was "blackmail," explaining that he would rather "refer to it (i. e., the negotiations—Ed.) as a two-way street."

Speaking from the floor, Gerald Gough, commented: "Everyone knows there's a need for a school—just walk through the halls of High Point. The developer knows there's a need and says, 'we'll meet your need if you meet our need.' In my opinion, it's highly unethical."

.         .         .         .         .

## Delay Probable

Mayor Edgar Smith remarked that it should be made clear that refusing the developer's terms did not necessarily mean the loss of the school site; that it would, however, probably mean a two or three year delay in the construction of the school.

.         .         .         .         .

Among the parents who spoke was Mrs. Joseph Rosetti, who said: "I have several children going into high school, but I would rather adhere to the Greenbelt

Master Plan than overcrowd the town with dense development. I would stand for my children's discomfort, rather than give in to a blackmailing scheme."

The following week, the News Review carried the sequel to its earlier story:

## COUNCIL REJECTS BY 4–1
## HIGH SCHOOL SITE DEAL

By Mary Lou Williamson

More than 150 citizens came to hear how the new City Council would respond to pressure by a local developer for higher density zoning on a large tract of land in exchange for uncontested consummation of the sale of a Greenbelt senior high school site to the Board of Education at the Council meeting Monday night.

Council sat quietly listening for more than an hour to citizen statements before voting to reject the proposal (4–1) with Councilman Dave Champion dissenting.

.     .     .     .     .

### Citizens Speak

A procession of citizens took the floor to make impassioned speeches—some from prepared texts, some extemporaneously. The mayor occasionally had to caution them to refrain from engaging in personalities.

Albert Herling suggested skulduggery in the September court postponement. Although he praised most of the City Manager's report, he criticized the section entitled "Risks and Conclusions," saying they appeared negative in the extreme. He suggested a list of positive steps that council ought to take: 1) fight Bresler's "blackmail"; 2) make clear to the Board of Education— no deals; 3) make clear to the District Council (zoning authority) unanimous opposition to the requested R–30 zoning; and 4) seek the swiftest possible court settlement. "For anything less," charged Herling, "Would

be other than what you believe. And when the chips are down, this is exactly what you'll do."

.        .        .        .        .

Pilski asked if anyone in the audience cared to speak in support of Bresler's proposal.

Only James Martin took the floor. He suggested that Bresler's action was not "blackmail" but the legitimate advance of his rights to develop his land. Martin suggested, by way of example, that GHI's long-range planning committee had been doing much the same thing some months ago. He alleged that the density of the "frame homes (GHI) is far more atrocious than anything Bresler's considering."

MR. JUSTICE WHITE, concurring.

I concur in the judgment of reversal and join the opinion of the Court insofar as it rests reversal on the erroneous definition of malice contained in the instructions given to the jury. I do not, however, join the remainder of the Court's opinion.

Respondent Bresler charged that he had been libeled by at least four statements published in petitioners' newspaper: (1) a statement that Bresler's conduct amounted to "a slight case of blackmail," accompanied by the use of the word "blackmail" as a column subheading; (2) a charge that Bresler had engaged in an "unethical trade"; (3) an allegation that Bresler had been guilty of "skulduggery," a word used by the newspaper to characterize statements made by others about Bresler; and (4) a statement that Bresler had had legal proceedings "started against him for failure to make construction corrections in accordance with county standards." Petitioners contended that the use of the word blackmail had not been intended in the criminal sense and was not libelous and that in any event the newspaper had not made its publications with malice, that is, with knowl-

edge that any of the statements were false or with reckless disregard of the falsity of any of them.

In instructing the jury the trial court defined libel as:

"the publication of words, pictures or symbols which imputes to a person a crime or a disgraceful or dishonest or immoral conduct or is otherwise injurious to the private character or credit of the person in the minds of a considerable and respectable class in the community. . . .

"[T]he burden is upon the plaintiff to establish by a preponderance of the evidence that the publication imputed to him a crime, or disgraceful, dishonest or immoral conduct or was otherwise injurious to his private character or credit . . . ." App. E. 189.

With respect to the dispute over the sense with which the charge of blackmail had been used the court told the jury:

"[I]f you are unable to conclude from the preponderance of the evidence that the publication bears a meaning ascribed to it by the plaintiff, or if you find that the evidence is equally balanced on that issue, then your verdict must be for the defendant.

.      .      .      .      .

"In considering the publication complained of, you must consider the publication as a whole—the Court would say in this case we are talking about serious, [sic] number of publications—and determine the meaning of the publication and how it would be understood by ordinary readers from the entire context thereof with the other facts and circumstances shown by the evidence.

"Where a publication is susceptible of two meanings one of those which would be libelous and the

other not, it is up to you to say which of the two meanings would be attributable to it, by those to whom it is addressed or by whom it may be read. In reaching your decision you can consider all the circumstances surrounding the publication, which includes all of the evidence which has been admitted." *Id.*, at E. 189–190.

The court also defined the crime of blackmail and told the jury that in this sense the defendant newspaper did not claim that the allegations were true.

Petitioners took exception to none of the foregoing instructions although in their motion for judgment n. o. v. or for a new trial, error was claimed in not instructing the jury that the failure to plead truth meant only that the defendants did not adopt the meaning of the words alleged by the plaintiff. See App. E. 10–11.

The jury returned a verdict for plaintiff, and judgment was entered on the verdict for both compensatory and punitive damages.

The Court of Appeals of Maryland affirmed. The court held that aside from federal constitutional protections urged by petitioners, the jury's verdict and subsequent judgment thereon were supported by the evidence. With respect to the blackmail charge the court said:

"In the instant case the word 'blackmail' was used as a sub-heading without qualification. The charge of blackmail was stated in the News Review issue of October 14, 1965, and was again repeated in the next week in the issue of October 21. The appellants argue that the word 'blackmail' was used in a noncriminal sense, but the intended meaning was for the jury to determine. *American Stores* v. *Byrd, supra*. The jury found against the appellants.

.        .        .        .        .

"The charging of Mr. Bresler with having committed blackmail could be found by the jury (as it was) to charge him with the commission of a crime." 253 Md. 324, 351–352, 252 A. 2d 755, 770 (1969).

The court also dealt with the other publications:

"In addition to the publications that Mr. Bresler had committed blackmail, there were publications that he had engaged in 'An unethical trade,' had been guilty of 'skulduggery,' had had legal proceedings 'started against him for failure to make construction corrections in accordance with county standards.' These allegations were injurious to Mr. Bresler in his business as a contractor and were libelous *per se.*" *Id.,* at 354, 252 A. 2d, at 772.

As for the issue of malice, the Court of Appeals noted that the newspaper knew the blackmail charge was false in the criminal sense. With reference to the charge of "skulduggery" the court pointed out that the newspaper had not quoted another source in using that word; rather, it was the publishers' own characterization of the events.

"There is little doubt that the word 'skulduggery' was intended to indicate dishonest conduct on the part of Bresler and to hold him up to ridicule and contempt. . . . The jury could properly conclude that the reports of the hearing were not accurately reported and were, also, published with a knowledge of their falsity or with serious doubt of their truthfulness." *Id.,* at 360, 252 A. 2d, at 775.

The court also held that the allegations that homeowners had started legal proceedings against Bresler in regard to construction defects in their homes built by him had been made with reckless disregard for the truth.

In reversing the Maryland Court of Appeals, the Court does not deny that the Constitution would permit recov-

ery for charging the crime of blackmail, or even for falsely accusing one of "blackmail" in a noncriminal but derogatory sense "injurious to the private character or credit of the person." The Court does not deny that the jury was told it had the authority to decide in what sense a word was used or understood, nor does the Court question the conclusion of the Court of Appeals that the jury had found that the word had been used and understood in the criminal sense. What the Court does hold on the cold record is that the trial judge, the jury, and the Maryland Court of Appeals were quite wrong in concluding that "ordinary readers" could have understood that a crime had been charged. If this conclusion rests on the proposition that there was no evidence to support a judgment that the charge of blackmail would be understood by the average reader to import criminal conduct, I cannot agree. The very fact that the word is conceded to have a double meaning in normal usage is itself some evidence; and without challenging the reading of the jury's verdict by the Maryland Court of Appeals, I cannot join the majority claim of superior insight with respect to how the word "blackmail" would be understood by the ordinary reader in Greenbelt, Maryland.

Although the Court does not so hold, arguably the newspaper should not be liable if it had no intention of charging a crime and had a good-faith, nonreckless belief that it was not doing so. Should *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), be extended to preclude liability for injury to reputation caused by employing words of double meaning, one of which is libelous, whenever the publisher claims in good faith to have intended the innocent meaning? I think not. The *New York Times* case was an effort to effectuate the policies of the First Amendment by recognizing the difficulties of ascer-

taining the truth of allegations about a public official whom the newspaper is investigating with an eye to publication. Absent protection for the nonreckless publication of "facts" that subsequently prove to be false, the danger is that legitimate news and communication will be suppressed. But it is quite a different thing, not involving the same danger of self-censorship, to immunize professional communicators from liability for their use of ambiguous language and their failure to guard against the possibility that words known to carry two meanings, one of which imputes commission of a crime, might seriously damage the object of their comment in the eyes of the average reader. I see no reason why the members of a skilled calling should not be held to the standard of their craft and assume the risk of being misunderstood—if they are—by the ordinary reader of their publications. If it is thought that the First Amendment requires more protection for the media in this respect in accurately reporting events and statements occurring at official meetings, it would be preferable directly to carve out a wider privilege for such reporting.

I agree with the Court that there was error in the instructions concerning malice. The error, however, is irrelevant to the "blackmail" phase of this case as I view it: if one assumes that the jury found that the crime of blackmail was charged, "malice" is conceded, since the defendants admittedly knew such a charge was false.

Nevertheless, the jury returned a general verdict; it might have found that the blackmail statement did not impute a crime, but that the other damaging statements published by the newspaper were libelous. Indeed, this was the most likely course for the jury to have taken if the Court is correct that there was so little reason for

24

basing liability on the blackmail allegation. Given this possibility, the error in the instructions requires reversal of the judgment. *Stromberg* v. *California,* 283 U. S. 359 (1931).

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurs in the judgment of the Court for the reasons set out in MR. JUSTICE BLACK's concurring opinion in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 293 (1964), in his concurring and dissenting opinion in *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 170 (1967), and in MR. JUSTICE DOUGLAS' concurring opinion in *Garrison* v. *Louisiana,* 379 U. S. 64, 80 (1964).