PHANTOM TOURING, INC.,
Plaintiff, Appellant,

v.

AFFILIATED PUBLICATIONS, et al., Defendants, Appellees.

Nos. 91–1590, 91–1741.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1991.

Decided Jan. 10, 1992.

Ronald D. Barber with whom H. Yale Gutnick, Strassburger, McKenna, Gutnick & Potter, Pittsburgh, Pa., Dennis J. Kelly, and Burns & Levinson, Boston, Mass., were on brief, for plaintiff, appellant.

E. Susan Garsh with whom Jonathan M. Albano, Lisa A. Eichhorn, and Bingham, Dana & Gould, Boston, Mass., were on brief, for defendants, appellees.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.

COFFIN, Senior Circuit Judge.

Appellant Phantom Touring Company produces a musical-comedy version of "The Phantom of the Opera" that is *not* the hugely successful, widely acclaimed Broadway show later created by Andrew Lloyd Webber. In a series of articles published in late 1989, the Boston Globe queried, in a disparaging tone, whether appellant's advertising made the distinction between the two "Phantoms" clear to the ticket-buying public. Appellant sued for defamation,[1] claiming that the newspaper falsely accused it of a deliberate effort to pass off its show—dubbed the "Fake Phantom"—as "the real thing." The district court dismissed the complaint on the ground that the articles contained only statements of opinion protected by the First Amendment. We agree that none of the articles is actionable and, therefore, affirm.

## I. *Background*[2]

The original "Phantom of the Opera" is a 1911 novel by Gaston Leroux, which is now in the public domain and therefore available for adaptation by anyone who chooses to make use of it. Appellant's version, a musical comedy show featuring the music of several classical composers, was created by British playwright Ken Hill and performed publicly for the first time in 1977 at the Duke's Playhouse in England. In 1984, the Hill production again was staged in England, where Andrew Lloyd Webber saw it. Webber and Hill began negotiations to bring the show to London's West End, but

---

1. The complaint also contained causes of action for interference with contractual rights and interference with prospective business advantage. Appellant does not press these claims on appeal.

2. We draw our background information primarily from the complaint, a sworn statement of facts by the producer of appellant's "Phantom" and appellant's reply to defendants' counterclaims.

nothing ever came of the collaboration. Instead, Webber wrote and, in October 1986, opened his own "Phantom" in London. The Webber production, a drama with an original musical score, became what the Globe termed a "megahit." In January 1988, Webber's "Phantom" opened in New York.

Meanwhile, in July 1986, Hill's "Phantom" was revived for a short run in St. Louis. It attracted the attention of Jonathon Reinis, a theatre producer, who brought the show to San Francisco for a nine-month run beginning in September 1988. Buoyed by the show's success in San Francisco, Reinis and others formed the appellant Phantom Touring Company to take the show on a national tour that included a visit to the Wang Center in Boston.

In September 1989, about a week before tickets for Hill's "Phantom" at the Wang were to go on sale, the Globe published the first of a number of articles suggesting that ticket buyers should be wary of Hill's "Fake Phantom." According to the article, headlined "The phantom of 'The Phantom,'" Hill had been "thriving off the confusion created by the two productions." The article quoted a drama critic for The Washington Post who said Hill's version "'bears as much resemblance to its celebrated counterpart as Jell-O does to Baked Alaska,'" and who further described the show as "'a rip-off, a fraud, a scandal, a snake-oil job.'"

This story and at least one other that followed not only pointed out that Hill was benefiting from mistaken identity, but also suggested that the confusion was intentional. The newspaper observed that the show was being advertised in bold type as "The Original London Stage Musical." While technically accurate, since Hill's production in fact predated Webber's, the notice appeared to the Globe to be drawing heavily on the reputation of the Webber show.

Appellant filed suit in November 1989, alleging that the Globe articles contained false and defamatory statements and innuendo concerning Phantom Touring.[3] The complaint referred to numerous specific phrases and words in the articles as well as to an alleged underlying message that the plaintiff was dishonest and intentionally misleading or cheating the public.

Defendants moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) and, in a brief order written on the face of the motion, the district court ruled for the Globe. It explained its decision as follows:

> I have carefully examined the publications and conclude that in context they contain only protected expression of opinion and do not imply criminal conduct on the part of the plaintiffs.

Appellant unsuccessfully moved for reconsideration and, following the Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, — U.S. —, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which clarified the principles governing the First Amendment's protection of statements of opinion, urged the district judge to vacate its ruling. The district court denied appellant's motion, holding, without discussion, that "the judgment should stand even in the light of *Milkovich*."

In this appeal, Phantom Touring contends that the district court's decision reflects the erroneous view that all of the disputed statements in the Globe articles were privileged under the First Amendment simply because they could be classified as opinion. Appellant argues that a careful analysis of the articles, in light of the principles set out in *Milkovich*, demonstrates that it is entitled to jury consideration of its libel claim. In the next section, we describe briefly how *Milkovich* affected defamation law and why application of the principles expressed in that opinion require us to affirm the district court's judgment.

---

**3.** The Boston Globe is owned and operated by defendants Affiliated Publications, Inc. and Globe Newspaper Corporation. For the sake of convenience, we refer to the corporate defendants solely as the Globe. Phantom Touring also sued two individual writers, Kevin Kelly and Patti Hartigan, who wrote the relevant articles.

## II. *Discussion*

### A. Legal Framework [4]

In *Milkovich*, the Supreme Court dismissed the notion that there is a "wholesale defamation exemption for anything that might be labeled 'opinion'." 110 S.Ct. at 2705. It concluded that the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact. *See id.* at 2707.

Notwithstanding its rejection of a specific "opinion" privilege, the Court assured that opinions about matters of public concern would continue to receive substantial constitutional protection under various extant First Amendment principles. It reaffirmed three propositions which are relevant to our consideration of this case in its present posture. The first, of "[f]oremost" importance, is the principle established in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), that statements made by a media defendant "must be provable as false" before there can be defamation liability. 110 S.Ct. at 2706. The Court reaffirmed that "*Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* (footnote omitted). Thus, a statement such as, "That's the worst play I've ever seen," would be protected not because it is labeled an opinion but because it is so subjective that it is not "susceptible of being proved true or false," *id.* at 2707.

Secondly, *Milkovich* emphasized a line of cases establishing protection for statements that "cannot 'reasonably [be] interpreted as stating actual facts' about an individual," 110 S.Ct. at 2706 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 108 S.Ct. 876, 878, 99 L.Ed.2d 41 (1988) (involving ad parody)). *See also Letter Carriers v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974) (use of the word "traitor" not basis for defamation action since used "in a loose, figurative sense"); *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970) (the word "blackmail" not actionable in context). These cases explicitly protect "rhetorical hyperbole" and other types of "imaginative expression" that writers use to enliven their prose. 110 S.Ct. at 2706. For example, a theater critic who wrote that, "The producer who decided to charge admission for that show is committing highway robbery," would be immune from liability because no reasonable listener would understand the speaker to be accusing the producer of the actual crime of robbery.

In addition to considering whether the challenged speech contained "loose, figurative, or hyperbolic language which would negate the impression" that a factual statement was being made, *id.* at 2707, the Court also indicated that the context in which language appears must be evaluated to see whether "the general tenor of the article negate[s] this impression," *id.* Thus, while eschewing the fact/opinion terminology, *Milkovich* did not depart from the multi-factored analysis that had been employed for some time by lower courts seeking to distinguish between actionable fact and nonactionable opinion. *See, e.g., McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir.1987) (adopting totality of the circumstances analysis); *Ollman v. Evans*, 750 F.2d 970, 974–75 (D.C.Cir.1984) (en banc) (same).

Finally, the Court referred to what we would characterize as a safety valve determination, in which we are obliged to "'make an independent examination of the whole record,'" *Milkovich*, 110 S.Ct. at 2705 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quotation omitted)), to "assur[e]

---

**4.** The Globe argues that we should apply Massachusetts constitutional and common law, arguably more generically protective of statements of opinion than the First Amendment. Because we believe the challenged articles are protected under First Amendment doctrine, as laid out in *Milkovich*, we need go no further. Moreover, we think it likely that it is the basis upon which the district court made its decision.

that the foregoing determinations will be made in a manner so as not to 'constitute a forbidden intrusion o[n] the field of free expression,'" *id.* 110 S.Ct. at 2707 (quoting *Bose,* 466 U.S. at 499, 104 S.Ct. at 1958 (quotation omitted)).

**B. Application of the Legal Principles**

■ In its complaint, appellant referred to six articles that appeared in the Globe between September 22 and October 7, 1989. One of those articles is not discussed in the brief on appeal, and we therefore assume that appellant does not seek review of the district court's decision with respect to that article.[5] Appellant does argue in its appellate brief, however, that another article, one not cited in the complaint, was defamatory. The story, "'Phantom' Confusion Still Flaring," was published on October 13, 1989, before appellant filed its complaint. We believe this article is not properly before us, and therefore decline to consider it.[6] Accordingly, we turn to our consideration of the remaining five articles.

■ In our view, most of the challenged language is easily identified as non-actionable under the principles outlined in *Milkovich.* Many of the statements cited in the complaint and appellate brief either constitute obviously protected hyperbole or are not susceptible of being proved true or false. Such, for example, is the language in "The phantom of the 'Phantom'" quoting a critic who described the Hill production as "a rip-off, a fraud, a scandal, a snake-oil job." Not only is this commentary figurative and hyperbolic, but we also

can imagine no objective evidence to disprove it. Whether appellant's "Phantom" is "fake" or "phony" is similarly unprovable, since those adjectives admit of numerous interpretations. *See McCabe v. Rattiner,* 814 F.2d at 842 ("The lack of precision [in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false.")[7]

■ Appellant's claim of defamation is patently deficient with respect to one news story, "Ticket buyers are still hot for 'Phantom,'" because the article lacks any even arguably defamatory assertions. Appellant's brief points to the following language:

The production is being billed as the "Original London Stage Musical" but is in no way related to the Andrew Lloyd Webber "Phantom" that was a smash hit in London and has broken all ticket records in New York since it opened in Janaury, 1988.

\* \* \* \* \* \*

The ads came into question in May when ticket sales opened in Atlanta, one of the stops on the 70–week national tour. The Georgia Governor's Office of Consumer Affairs looked into the possibility of deception, but determined that the advertisements were not deceptive so long as they included a disclaimer that the show was not the Lloyd Webber version.

We think it inconceivable that the Globe could be held liable for reporting, in the first of these paragraphs, that Hill's "Phantom" is not Webber's. As for the

---

**5.** The article apparently dropped from the case appeared on October 4, 1989 under the headline "Other 'Phantom' Smashes Record."

**6.** Appellant appears to believe it appropriate for us to review the October 13 article because several sentences from the piece were cited in its brief in support of its Motion for Reconsideration. We disagree. In our view, a defendant is entitled to knowledge of the precise language challenged as defamatory, and the plaintiff therefore is limited to its complaint in defining the scope of the alleged defamation. If plaintiff wished to enlarge its case beyond the six articles originally challenged, it should have sought to amend the complaint.

**7.** It is likewise impossible to verify whether the Hill advertising was—as described in "The phantom of the 'Phantom'"—"subliminally deliberate," the two words in that phrase seeming to cancel each other out. *See The Random House Dictionary of the English Language* 1894 (2d ed.1987) (defining "subliminal" as "existing or operating below the threshold of consciousness"). Similarly, the "truth-in-advertising with an undertow" phrase that appeared in the same article is figurative language with no concrete definition. Even the less figurative assertion that appellants are "blatantly misleading the public," which appeared in "Williams and 'The Phantom,'" is subjective and imprecise, and therefore not capable of verification or refutation by means of objective proof.

second paragraph, appellant does not challenge the accuracy of the information. Because the article also points out that appellant's Boston advertising includes a disclaimer, it effectively tells readers that the advertising is not deceptive. We thus find nothing actionable in this article.

■ In our view, appellant's claim of defamation is colorable in only one respect. Two of the contested articles, both columns written by theater critic Kevin Kelly, contain language insinuating that Phantom Touring was marketing its production dishonestly—that it deliberately was confusing the public. The first such statement appears in "The phantom of the 'Phantom'" [hereafter "The phantom 'Phantom'"], where Kelly questions whether "Hill & Company [is] trying to score off the success of Andrew Lloyd Webber's 'Phantom'". The second reference appears in "Canny, confusing marketing for this 'Phantom'" [hereafter "Canny marketing"]:

> When it was suggested to Josiah Spaulding, who heads the Wang (and wags it), that, surely, he must be aware the incoming "Phantom"—a musical comedy by Ken Hill—is deliberately confusing people; that, in fact, it wouldn't be on tour at all if the Webber "Phantom" had not become the megahit it has, he said to me, "We're not in the business of denying any genre to come here and rent the hall."

Arguably, the connotation of deliberate deception is sufficiently factual to be proved true or false, and therefore is vulnerable under *Milkovich*. To rebut the

implied assertion, appellant might be able to present objective evidence demonstrating longstanding plans to take its "Phantom" on a nationwide tour of the United States, or evidence showing that the "Original London production" language in its advertising was developed before Webber's "Phantom" rose to prominence, and thus was not designed to deceive consumers.

Whether or not the allegation of intentional deception meets the "provable as true or false" criterion, however, we think the context of each article rendered the language not reasonably interpreted as stating "actual facts" about appellant's honesty.[8] The sum effect of the format, tone and entire content of the articles is to make it unmistakably clear that Kelly was expressing a point of view only. As such, the challenged language is immune from liability.

The nonfactual nature of Kelly's articles is indicated at first glance by the format. Both appeared as a regularly run theater column, a type of article generally known to contain more opinionated writing than the typical news report.[9] The structure and tone of the language reinforced this subjective design. In "The phantom 'Phantom,'" for example, the question of appellant's dishonesty was posed rhetorically and then immediately defused by Reinis' lengthy response.[10] In "Canny marketing," the issue again was raised as a question posed to the Wang Center's manager, and Kelly's snide, exasperated language indicated that his comments represented his personal appraisal of the factual information contained in the article. *Cf. Milko-*

---

**8.** We offer no views on whether appellant's defamation claim is deficient for reasons other than the nonfactual nature of the challenged language, such as truthfulness or lack of malice.

**9.** Although the Court in *Milkovich* gave no significance to the fact that the challenged article was a sports column, we do not understand the Court to have rejected the relevance of format, but simply to have discounted it in the circumstances of that case. *See* 110 S.Ct. at 2707 (referring to the general tenor of the article).

**10.** The question and answer as they appeared in the article were as follows:

So the question comes down to, is Hill & Company trying to score off the success of Andrew Lloyd Webber's "Phantom"?

"Whatever confusion there is between the two," Reinis said, "it's about time Ken Hill got his just desserts," a statement implying that Hill has been ill used by Webber and [his producer] Mackintosh. "They've wished us luck. Our attitude is: we're not Andrew Lloyd Webber's 'Phantom.' We say that clearly in the ads. We're not a melodrama. We're musical comedy in the old-fashioned sense. We're nothing near the scope and size of Webber's 'Phantom.' We're an evening's event for entertainment. Our attitude is, you can enjoy both for completely different reasons."

*vich,* 110 S.Ct. at 2707 (neither the type of language used nor the general tenor of the article would "negate the impression that the writer was seriously maintaining petitioner committed the crime of perjury").

Of greatest importance, however, is the breadth of Kelly's articles, which not only discussed all the facts underlying his views but also gave information from which readers might draw contrary conclusions. In effect, the articles offered a self-contained give-and-take, a kind of verbal debate between Kelly and those persons responsible for booking and marketing appellant's "Phantom." Because all sides of the issue, as well as the rationale for Kelly's view, were exposed, the assertion of deceit reasonably could be understood only as Kelly's personal conclusion about the information presented, not as a statement of fact.

Kelly explained, for example, that he considered appellant's advertising to be misleading—despite Hill's accurate claim to be the "original" London production—because

> it is the Webber "Phantom" that is currently the big hit in London, and has been since it opened in 1986. It is the Webber "Phantom" that has broken box office records wherever it has played. It is the Webber "Phantom" that's original. Hill uses music from Verdi, Gounod, Offenbach, Mozart and Donizetti. Webber wrote his own. Hill's is a self-styled "melodramatic spoof." Webber's has a serious book written by himself and Richard Stilgoe. ["Canny marketing"] [11]

Kelly also made clear that he doubted appellant's marketing sincerity because— while distinguishing between the two "Phantoms" in its advertising—it did so discreetly, reserving "[t]he big type . . . for the show's resonant title with a banner head reading ' "The Original London Stage Musical" ' ["Canny marketing"]. The articles additionally reveal that Kelly's judgment about the advertising was based at least in part on his subjective view that Hill's show lacked artistic merit; it must be the result of deceptive marketing, he implied, if "a spoof without stars or anyone of theatrical name value" could produce

$400,000 in ticket sales in a few days. ["Canny marketing"]. *Cf. United States Medical Corp. v. M.D. Buyline, Inc.,* 753 F.Supp. 676, 677, 679 (S.D. Ohio 1990) (no background facts offered to readers to explain statement that plaintiff "consistently gouges customers on price and service").

On the other hand, Kelly forthrightly reported that not everyone shared his artistic judgment, and that the Hill production had encountered its fair share of success. In "The phantom 'Phantom,' " he quoted producer Reinis' report that 200,000 people saw the production during a lengthy run in San Francisco, as well as Reinis' claim that "[c]ritics may not like us, but audiences do." This competing information about the merit of Hill's "Phantom" underscored the personal and nonfactual nature of Kelly's views about the production and its attendant publicity.

Kelly's full disclosure of the facts underlying his judgment—none of which have been challenged as false—makes this case fundamentally different from *Milkovich.* The column found actionable there focused on a court decision reversing an administrative ruling that had suspended a high school wrestling team from a tournament because of a brawl at an earlier meet. The column was headlined, "Maple [Heights High School] beat the law with the 'big lie,' " and the writer's theory was that school officials had lied at the court hearing in order to persuade the judge to overrule the athletic association's decision. *See* 110 S.Ct. at 2698 n. 2.

The reporter had not been at the judicial proceeding. The column noted, however, that he had been the only non-involved person at both the controversial meet and the administrative hearing, a fact that could have suggested to readers that he was uniquely situated to draw the inference of lying. The column contained no response from the targets of the criticism.

Thus, the article in *Milkovich,* unlike Kelly's "Phantom" columns, was not based on facts accessible to everyone. Indeed, a reader reasonably could have understood the reporter in *Milkovich* to be suggesting that he was singularly capable of evaluat-

---

**11.** "The phantom 'Phantom' " contains similar information about each production.

ing the plaintiffs' conduct. In contrast, neither of Kelly's columns indicated that he, or anyone else, had more information about Phantom Touring's marketing practices than was reported in the articles.[12] While Kelly's readers implicitly were invited to draw their own conclusions from the mixed information provided, the *Milkovich* readers implicitly were told that only one conclusion was possible. This is a crucial distinction, and it makes it clear why the result reached in *Milkovich* is inappropriate here.

In this case, the comprehensive nature of the information provided in the articles, aided by the column format and the style and tenor of the writing, lead inevitably to the conclusion that no reasonable reader could interpret Kelly's statements as factual assertions of dishonesty. Accordingly, under *Milkovich*, they are not actionable.[13]

### III. *Conclusion*

The Supreme Court in *Milkovich* reasserted its commitment to ensuring that debate on public issues remain " 'uninhibited, robust, and wide-open,' " 110 S.Ct. at 2706 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)), while acknowledging

**12.** In its brief, appellant contends that the Globe lent support to its defamatory accusations by reporting that the Georgia Governor's Office of Consumer Affairs required an advertising disclaimer distinguishing Hill's show from Webber's. We note, first, that this information did not appear in the two "Backstage" columns that contain the language warranting our attention. Second, the two articles that did contain this information pointed out that appellant's Boston advertising included a disclaimer, and thus implicitly told readers that the advertising was legally adequate. ["Ticket buyers are still hot for 'Phantom,'" and "Williams and 'The Phantom.'"]

**13.** Although the Supreme Court's discussion in *Milkovich* did not explicitly address statements reasonably viewed only as opinion because based on fully disclosed information, its reaffirmation of the line of cases represented by *Bresler*, 398 U.S. at 6, 90 S.Ct. at 1537, *Letter Carriers*, 418 U.S. at 264, 94 S.Ct. at 2770, and *Falwell*, 485 U.S. at 46, 108 S.Ct. at 877, confirmed that, to be actionable, a challenged statement must be understood as stating actual facts about an individual. That principle unquestionably excludes from defamation liability not only

the countervailing concern that due weight be given to society's " 'pervasive and strong interest in preventing and redressing attacks upon reputation,' " *id.* 110 S.Ct. at 2707 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966)). For the reasons we have explained, the Globe articles tread a permissible path.

*The judgment of the district court is therefore affirmed.*

statements of rhetorical hyperbole—the type of speech at issue in the *Bresler–Letter Carriers-Falwell* cases—but also statements clearly recognizable as pure opinion because their factual premises are revealed. *See Milkovich*, 110 S.Ct. at 2712 n. 7 (dissenting opinion of Brennan, J.). Both types of assertions have an identical impact on readers—neither reasonably appearing factual—and hence are protected equally under the principles espoused in *Milkovich*.

A number of courts, including Massachusetts, have immunized statements of opinion based on fully disclosed nondefamatory facts. *See National Ass'n of Government Employees, Inc. v. Central Broadcasting Corp.*, 379 Mass. 220, 226–28, 396 N.E.2d 996 (1979) ("[A] state of affairs in which opinion is recognizable as such because its factual ingredient is known or assumed, presents a clear case for full First Amendment protection including freedom from civil liability.") *See also, e.g., Potomac Valve & Fitting Inc.*, 829 F.2d 1280, 1290 (4th Cir.1987); *Dunlap v. Wayne*, 105 Wash.2d 529, 540, 716 P.2d 842, 848–49 (1986); Restatement (Second) of Torts § 566 comment c (1977).