UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVID W. SCHNARE,
         *Plaintiff-Appellant,*

v.

BERNARD W. ZIESSOW; HARRIS
PUBLICATIONS, INCORPORATED,
         *Defendants-Appellees.*

No. 03-1879

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-03-366-A)

Argued: May 6, 2004

Decided: July 13, 2004

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** David Walter Schnare, Fairfax Station, Virginia, for
Appellant. Robert Richardson Vieth, COOLEY GODWARD, L.L.P.,
Reston, Virginia, for Appellee Harris Publications, Incorporated;
Heather Kathleen Bardot, TRICHILO, BANCROFT, MCGAVIN,
HORVATH & JUDKINS, Fairfax, Virginia, for Appellee Ziessow.
**ON BRIEF:** George E. Marzloff, Stafford, Virginia, for Appellant.
Brian M. Koide, COOLEY GODWARD, L.L.P., Reston, Virginia, for

Appellee Harris Publications, Incorporated; Steven W. Bancroft, John C. Nicols, TRICHILO, BANCROFT, MCGAVIN, HORVATH & JUDKINS, Fairfax, Virginia, for Appellee Ziessow.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Labrador Retrievers, in order to compete as show dogs, must meet specific breed standards such as height and weight requirements. When changes to these standards were proposed, many Labrador owners and breeders recognized that their dogs could become ineligible for competition. A group of those affected by the changes first opposed their adoption and then sought to prevent their implementation through litigation that proved unsuccessful. After the litigation was over, the weekly magazine *Dog News* published a three-part article, "Revising A Standard," which chronicled the changes to the Labrador breed standard and the ensuing controversy. The author, Dr. Bernard W. Ziessow, was among the proponents of the revised standard, and throughout the article he criticized those who opposed the revision, including Dr. David W. Schnare. After the article was published, Schnare sued Ziessow and Harris Publications, Inc., the publisher of *Dog News*, alleging defamation and intentional infliction of emotional distress. The district court determined that the challenged statements in the article were not actionable as defamation and granted the defendants' motion to dismiss. Finding no error, we affirm.

I.

Schnare and Ziessow are both long-time owners and breeders of Labrador Retrievers, and both have served in official capacities in the Labrador Retriever Club (LRC). Schnare and Ziessow positioned

themselves on opposite sides of the Labrador breed standard controversy when Ziessow was appointed in 1987 to chair a committee formed to propose changes to the standard. Under the LRC's constitution a revision to the breed standard must be approved by LRC's members, and it becomes effective when the American Kennel Club (AKC) approves it. Schnare organized a September 1989 meeting of regional and local Labrador clubs in an effort to generate opposition to the revised standard. At the meeting club representatives signed a joint letter to the AKC indicating the clubs' opposition to the change. Shortly thereafter, in November 1989, the AKC returned the proposed standard to the LRC for reconsideration.

In May 1992 Ziessow was reappointed by the LRC to chair the committee to revise the Laborador standard. The LRC submitted its second proposed standard to the AKC in November 1993. The AKC approved the revised standard in February 1994, and it became effective the following month. The revised standard requires (among other things) Labradors to be within a certain height range in order to compete in AKC dog shows; thus, some dogs that previously competed at shows became ineligible for competition. In May 1994 Schnare and a group of owners, breeders, and sellers of Labrador Retrievers filed an action to enjoin the AKC from implementing and enforcing the new standard. *Jessup v. American Kennel Club, Inc.*, 862 F. Supp. 1122 (S.D.N.Y. 1994). After that action was unsuccessful, several Labrador breeders in 1997 filed a class action antitrust suit against the AKC and the LRC for damages and injunctive relief. *Jessup v. American Kennel Club, Inc.*, 1997 WL 525405 (S.D.N.Y. 1997). The second action was also unsuccessful: the district court awarded summary judgment to the defendants in 1999, *Jessup v. American Kennel Club, Inc.*, 61 F. Supp. 2d 5 (S.D.N.Y. 1999); the Second Circuit affirmed without opinion in 2000, *Jessup*, 210 F.3d 111 (2d Cir. 2000); and the Supreme Court denied certiorari in 2001, *Jessup*, 531 U.S. 1072 (2001).

Ziessow published his three-part *Dog News* article, "Revising A Standard," in January and February 2002. The article recounts the controversy over the revised breed standard and the years of litigation that followed. Ziessow proceeds to state that "[t]he intent of this communication is to answer the half-truths, innuendoes and outright lies perpetrated by certain parties to the suit, and their fellow travelers, to

bemuch [sic] the reputation and good name of some officers and directors, and to tell the true story." J.A. 60. The ongoing tension between Schnare and Ziessow figures prominently in the three-part article. For instance, Ziessow writes that when he learned that Schnare had called a meeting of the regional and local Labrador clubs, Ziessow asked that he or John McAssey, the LRC president, be allowed to attend. Ziessow writes that although Schnare told him their presence would not be useful, Schnare later told those at the meeting that the two men were invited but refused to attend. He also attacks Schnare's letter-writing campaign, which criticized the process of revising the breed standard and ultimately squelched the first proposed standard. Concluding Part I of his article, Ziessow states, "[i]t is a sad commentary that a member club's reputation and loyalty of over fifty years could be questioned on the basis of falsehoods, half-truths, and fabricated charges instigated by a self-promoting patriarch and his disciples." J.A. 65.

The second installment (or Part II) of Ziessow's article primarily chronicles the subsequent effort to revise the standard, which culminated in approval by the AKC, but which prompted years of litigation. Part II also discusses the charge a certain individual filed with the AKC against the LRC, Ziessow, and others for (among other things) failure to follow stated procedures for revising the breed standard. The charge, which sought disciplinary action against its targets, relied in part on an affidavit from Schnare that was originally submitted in the antitrust litigation. After criticizing certain accusations in the affidavit, Ziessow concludes Part II as follows:

> As a matter of interest, I looked up the meaning of "affidavit" in Webster's Dictionary, it is defined as follows. "A written declaration upon oath; *A statement of facts* in writing signed by the party and sworn to or confirmed by declaration before an authorized magistrate. It says nothing about nor does it include fabrications, distortions, half-truth, innuendo or hearsay.

> Rather it should be a statement of facts.

J.A. 76 (emphasis in original). As if to highlight the injury caused by his adversaries, Ziessow then appends a quotation from the Book of Luke, "Father, forgive them, for they know not what they do." *Id.*

The final installment (Part III) of "Revising A Standard" resumes its criticism of Schnare's affidavit, though in increasingly excited language. Indeed, Part III begins with one of the Ten Commandments, "Thou shalt not give false testimony against thy neighbor." J.A. 79. The first two paragraphs of the article then read as follows:

> The evidence the plaintiffs presented to the United States District Court . . . of alleged irregularities in the LRC standard setting processes consisted of an affidavit from David Schnare and a portion of the deposition testimony of Bernard Ziessow. As stated previously, an affidavit is defined as "A written declaration upon oath, a statement of facts in writing signed by the party and sworn to or confirmed by declaration before an approved magistrate". Dr. Schnare's affidavit, which was presented to the court contains some sixty pages of fact and fiction, innuendo, half-truths, exaggerations and fabrications. He also uses his role as a witness as an opportunity to besmirch the reputation of individuals for who [sic] he has a personal vendetta.

> "Do not go about spreading slander about your people." Leviticus 19:16.

J.A. 79.

Ziessow states that he will "not attempt to repute [sic] or rectify all misstatements of fact, untruths or distortions contained in the affidavit," but rather will "respond to those believe [sic] most harmful to the LRC." J.A. 80. He then proceeds to quote various statements from the affidavit and challenge them factually, while punctuating his discussion with colorful maxims. Wrapping up one critique of Schnare's assertions, Ziessow insists: "Many of Dr. Schnare's statements, in addition to being untrue are outright ridiculous and purely of his own making—he would have been well to heed the old Hebrew proverb: 'Many things sound better with your mouth shut'." J.A. 83. Eventually, he brings Part III to a close with the following:

> It is unfortunate that a few have to drag the breed through the mud as they wallow in the slime of their own corruption. "Those who would corrupt the mind are just as evil as those

who steal." I believe I have provided enough evidence to respond to Dr. Schnare's so called Affidavit. Where he obtained his information, only he knows, what he is attempting to accomplish is obvious—"Either dazzle the reader with brilliance or befuddle them with bullcrap." In either case, the affidavit contains more than enough lies, fabrications and inaccuracies to cast a serious doubt on the value of the entire document.

J.A. 85.

Schnare sued Ziessow and Harris Publications for defamation and intentional infliction of emotional distress in Virginia state court, and the defendants removed the case, based on diversity jurisdiction, to the United States District Court for the Eastern District of Virginia. Harris Publications moved to dismiss under Rule 12(b)(6), claiming the statements were not actionable as defamation under Virginia law. A hearing followed, at which Ziessow orally joined Harris Publications' motion. The district judge granted Harris Publications' motion to dismiss at the hearing on May 2, 2003, and granted Ziessow's motion on June 11, 2003. Schnare appeals only the dismissal of his defamation claim.

## II.

Schnare contends that Ziessow's article is libelous because it accuses him of perjury in the litigation related to revising the breed standard. Schnare relies particularly on statements made in Part III of the article, such as the characterization of his affidavit as containing "some 60 pages of fact and fiction, innuendo, half-truths, exaggerations and fabrications." J.A. 79. Pointing to this and seventeen additional statements that he claims assert or imply perjury, Schnare maintains that Ziessow's article is defamatory per se. The district court disagreed, holding that the statements were expressions of opinion and inactionable as a matter of law.

In Virginia the elements of common law defamation are the "(1) publication of (2) an actionable statement with (3) the requisite intent." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (applying Virginia law). A statement is actionable if it contains

a false assertion of fact that "tend[s] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* There are, of course, "constitutional limits on the *type* of speech" that is subject to a defamation action. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16 (1990)(emphasis in original). If a statement "cannot reasonably be interpreted as stating actual facts about an individual," it cannot be the subject of a defamation suit. *Id.* at 20 (internal quotation marks and citations omitted). *See also Yeagle v. Collegiate Times*, 497 S.E.2d 136 (Va. 1998); *WJLA-TV v. Levin*, 564 S.E.2d 383 (Va. 2002).

Typically, the types of speech that will enjoy the *Milkovich* protection are pure expressions of opinion and rhetorical hyperbole. Though the *Milkovich* Court explicitly declined to provide an "exemption [from liability] for anything that might be *labeled* 'opinion,'" it emphasized that a statement must state or imply a defamatory fact to be actionable. 497 U.S. at 19 (emphasis added). This means that although someone cannot preface an otherwise defamatory statement with "in my opinion" and claim immunity from liability, a pure expression of opinion is protected because it fails to assert an actual fact. Rhetorical hyperbole, in contrast, might appear to make an assertion, but a reasonable reader or listener would not construe that assertion seriously. For instance, in *Greenbelt Coop. Publ'g Assoc., Inc. v. Bressler*, 398 U.S. 6 (1970), a local newspaper published certain articles characterizing a real estate developer's negotiation position as "blackmail." The Supreme Court stated that a reader of the article would recognize that the word "was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] position extremely unreasonable." *Id.* at 14. Protection for this type of speech, the Court explained, "provides assurance that public debate will not suffer for lack of imaginative expression . . . which has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20 (internal quotation marks omitted).

In determining whether a statement can be reasonably interpreted as stating actual facts about an individual, we look to the circumstances in which the statement is made. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998). Ziessow readily uses labels such as "lie," "fabrication," and "falsehood," but the defamatory capability of these terms cannot be determined on a per se basis. *See Dil-*

*worth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996). Specifically, we consider whether the language used is "'loose, figurative, or hyperbolic language,'" as well as the "'general tenor of the article.'" *Id.* at 184 (quoting *Milkovich*, 497 U.S. at 21).

Whether the statements in Ziessow's article are actionable thus depends on whether a reasonable reader would construe them as seriously asserting that Schnare committed the crime of perjury. *Milkovich*, 497 U.S. at 21. Reading the statements from Schnare's complaint in context, we conclude that each one is properly understood as either opinion or hyperbole. Many of the statements are only vaguely insinuating and not even arguably defamatory (for example, "One would believe a person of Dr. Schnare's education and background would be certain of the facts prior to signing an affidavit." J.A. 82.). Other statements, which on their face are accusations of lying, are actually vigorous and angry expressions of disagreement. In one instance, Ziessow characterizes a portion of the Schnare affidavit as a "vicious assassination of character and an outright lie." J.A. 85. Taken in context, the statement is a response to Schnare's accusation that Ziessow wanted to revise the breed standard in order to drive competitors from the market for his own financial gain. Ziessow similarly characterizes Schnare's comment that he was able to identify LRC members by their ballots, which implied that Ziessow might have tampered with the voting process. In this way, Ziessow appears to be dramatizing a belief that Schnare is morally culpable for making reckless accusations against him, which is underscored by the maxims and Biblical quotations inserted throughout the article. A reasonable reader would therefore recognize this "accusation" of lying as just an "expression of outrage," much like an accusation by a talk show host that the Eleventh Circuit held was rhetorical hyperbole. *Horsley v. Rivera*, 292 F.3d 695, 701-02 (11th Cir. 2002). Though the talk show host stated that the plaintiff (a guest on the program) was an "accomplice to homicide," the Eleventh Circuit held that the accusation merely reflected the host's belief that the plaintiff was morally culpable in a particular homicide; it was not, therefore, a literal assertion that the plaintiff committed a felony. *Id. See also Flowers v. Carville*, 310 F.3d 1118, 1127 (9th Cir. 2002).

Furthermore, in those instances when Ziessow accuses Schnare of specific misstatement, he discloses the factual basis for his disagree-

ment, allowing the reader to draw her own conclusion. *See Biospherics*, 151 F.3d at 185. For instance, Ziessow quotes Schnare's affidavit as stating, "Under the 1994 AKC/LRC standard a yellow dog bred from AKC registered Labrador retrievers that did not have a black nose or eye rims could not be registered in AKC registry, could not compete at AKC licensed judging events as an 'AKC Champion Stock Labrador Retriever'." J.A. 81. Ziessow then retorts that these statements are "incorrect, either through ignorance or as an attempt to deceive," adding that "[i]n either case they are lies under oath." *Id.* Ziessow then goes on to explain the AKC's disqualification rules in an attempt to show that Schnare is mistaken. Of course, a statement uttered in ignorance is not a lie under oath. This type of loose language further suggests that Ziessow's article is more of an opinionated and hyperbolic screed than a defamatory piece of journalism.

Our view of these statements is reinforced by a First Circuit case involving a similar mix of opinion and hyperbole. *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730-31 (1st Cir. 1992). The defamation alleged in *Phantom Touring* appeared in an article describing a musical comedy version of "The Phantom of the Opera" that was confused with the hugely successful Broadway show. The article stated that the producers of the musical comedy benefitted from the confusion, questioned whether advertisers made the distinction clear to the ticket-buying public, and quoted a drama critic as describing the show as "a rip-off, a fraud, [and] a scandal." *Id.* at 726. The First Circuit affirmed the dismissal of the defamation action because the author, who was held merely to be expressing his opinion, "not only discussed all the facts underlying his views but also gave information from which readers might draw contrary conclusions." *See Phantom Touring*, 953 F.2d at 729. The attacks on the play, the court explained, constituted "a self-contained give-and-take, a kind of verbal debate between [the author] and those persons responsible for . . . marketing appellant's 'Phantom.'" *Id.* at 730. It therefore held that "the assertion of deceit reasonably could be understood only as [the author's] personal conclusion about the information presented, not as a statement of fact." *Id.*

Finally, the strongest language, and the only remaining statement deserving attention, is the characterization of Schnare's entire affidavit as "some 60 pages of fact and fiction, innuendo, half-truths, exag-

gerations and fabrications." J.A. 79. Even here, the context of Ziessow's article, with its snide tone, stern quotations, and responsive posture, alert the reader to the hyperbolic nature of the statements. The harsh characterization merely serves as an introduction to the numerous disagreements with Schnare's affidavit detailed in the pages that follow. Given that Schnare contended that the voting process, which Ziessow oversaw, was open to mischief, a reasonable reader would interpret Ziessow's response as no more than a "lusty and imaginative expression of the contempt felt" toward his adversary in the controversy about revising the breed standard. *Nat'l Assoc. of Letter Carriers v. Austin*, 418 U.S. 264, 286 (1974). We therefore hold that the challenged statements "belong[ ] to the language of controversy rather than to the language of defamation." *Dilworth*, 75 F.3d at 310. In short, the statements might be offensive, but they are not defamatory. The judgment of the district court is therefore affirmed.

*AFFIRMED*