# STATE OF MICHIGAN
# COURT OF APPEALS

BRYAN PUNTURO, FAWN PUNTURO, and B
& A HOLDINGS, LLC, doing business as
PARKSHORE RESORT, LLC,

        Plaintiffs-Appellees/Cross-
        Appellants,

v

BRACE KERN,

        Defendant-Appellant/Cross-
        Appellee,

and

SABURI BOYER and DANIELLE KORT,
formerly known as DANIELLE BOYER,

        Defendants.

UNPUBLISHED
October 16, 2018

No. 338727
Grand Traverse Circuit Court
LC No. 17-032008-CZ

---

BRYAN PUNTURO, FAWN PUNTURO, and B
& A HOLDINGS, LLC, doing business as
PARKSHORE RESORT, LLC,

        Plaintiffs-Appellees/Cross-
        Appellants,

v

BRACE KERN and SABURI BOYER,

        Defendants,

and

DANIELLE KORT, formerly known as
DANIELLE BOYER,

No. 338728
Grand Traverse Circuit Court
LC No. 17-032008-CZ

-1-

Defendant-Appellant/Cross-
Appellee.

---

BRYAN PUNTURO, FAWN PUNTURO, and B
& A HOLDINGS, LLC, doing business as
PARKSHORE RESORT, LLC,

      Plaintiffs-Appellees/Cross-
      Appellants,

v

BRACE KERN and DANIELLE KORT, formerly
known as DANIELLE BOYER,

      Defendants,

and

SABURI BOYER,

      Defendant-Appellant/Cross-
      Appellee.

No. 338732
Grand Traverse Circuit Court
LC No. 17-032008-CZ

---

Before: BECKERING, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

In this consolidated appeal arising out of a claim of defamation, defendants appeal by leave granted and plaintiffs cross-appeal the order of the trial court denying defendants' motions and plaintiffs' cross-motion for summary disposition.[1] We affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Defendant Saburi Boyer operated a parasailing business in Traverse City. In an effort to limit competition, Boyer[2] began negotiations with plaintiff Bryan Punturo, who owned and

---

[1] *Punturo v Kern*, unpublished order of the Court of Appeals, entered December 5, 2017 (Docket Nos. 338727, 338728, & 338732).

operated a hotel and conference facility on the water. Punturo threatened to begin a parasailing business, charge much lower prices than Boyer, and put him out of business. Punturo informed Boyer that he would not do so if Boyer agreed to pay him $19,000 per year. Boyer agreed and signed an exclusivity agreement.

After complying with the contract for some time, Boyer stopped making payments. Punturo contacted Boyer and his wife, defendant Danielle Kort, seeking continued payments. According to defendants, Punturo was aggressive and inappropriate in his attempts. Eventually, Boyer and Kort contacted defendant Brace Kern, an attorney, to represent them and determine if there was any legal recourse for them against Punturo. Kern reviewed the contract and the communications between the parties and found what he believed to be violations of the Michigan Antitrust Reform Act (MARA), MCL 445.771 *et seq*. Kern reported those findings to the Michigan Attorney General (AG) and filed a civil suit against Punturo, alleging "flagrant violations" of MARA. Upon reviewing the case, the AG filed felony extortion charges against Punturo. The AG subsequently issued a press release, describing the circumstances behind the alleged crime. The press release ended with the following disclaimer: "A criminal charge is merely an accusation and the defendant is presumed innocent unless proven guilty."

Following the AG's press release, the Traverse City area news media picked up on the story. Kern contacted Punturo's attorney to discuss settling the civil suit. Kern reported that Boyer and Kort were willing to settle their claim for $750,000, and in exchange, they would report their satisfaction with the resolution of the case to the news media. According to Punturo, the e-mail insinuated that bad press would be detrimental to Punturo's pending criminal charges. Punturo refused the settlement offers. Subsequently, over the course of several interviews, defendants made statements to different news media outlets, including newspapers, television, and radio stations, about the case. Kern and Boyer both stated, on several occasions, that Punturo had committed extortion in his dealings with Boyer. Kern also stated that Punturo violated MARA. Boyer and Kort explained that they were in fear of Punturo, that he used threatening, vulgar language, and that they reported the issue to Kern, who discovered antitrust violations.

Eventually, both the civil and criminal suits pending against Punturo were dismissed. The district court determined that there was not probable cause to believe that Punturo committed any crimes, so refused to bind the case over. The civil case was summarily disposed after the trial court explained that there had not been any MARA violations, considering Boyer himself was a party to the allegedly violative contract.

Plaintiffs followed up by filing the instant litigation, in which they asserted that defendants' statements were defamatory. Plaintiffs contended that the statements were accusations of crimes, and thus defamation per se, and that Boyer and Kort could be held vicariously liable for the statements of their attorney, Kern. Defendants, in lieu of filing answers, each filed motions for summary disposition. All of the defendants argued that their

---

[2] This opinion will refer to Saburi Boyer as "Boyer" and Danielle Kort, formerly known as Danielle Boyer, as "Kort."

statements were protected by Michigan's fair-reporting privilege, MCL 600.2911(3), or were protected under the First Amendment as opinion or rhetorical hyperbole. Boyer and Kort argued separately that they could not be held vicariously liable for the statements of Kern, and that their individual statements were not capable of defamatory meaning.

Plaintiffs argued to the contrary, asserting that the fair-reporting privilege did not apply to statements that crimes had been committed with certainty when only charges were pending, and that defendants' statements were accusations of criminal conduct, not expressions of opinion or rhetorical hyperbole. Further, because there was a question of fact whether Kern made the defamatory statements in furtherance of Boyer and Kort's lawsuit against Punturo, they could be held vicariously liable for his statements. Plaintiffs also argued that summary disposition was warranted in their favor pursuant to MCR 2.116(I)(2) where they had pleaded and proved a claim of defamation per se.

Defendants replied, insisting that the fair-reporting privilege applied because their statements reflected the accusations made in the public record, and that their use of the words "extortion" and "anti-trust" violations merely were statements amounting to subjective opinion or rhetorical hyperbole. Boyer and Kort argued that they could only be held responsible for Kern's torts if they were in control of his statements, which they could not be, because his statements violated MRPC 3.6, which necessarily fell outside their authority to control his representation.

The trial court considered those arguments and agreed with plaintiffs on the issue of the fair-reporting privilege, speech protected as opinion or rhetorical hyperbole, and vicarious liability. The trial court then denied defendants' motions for summary disposition. The trial court also denied plaintiffs' cross-motion for summary disposition, reasoning that there still remained questions of fact regarding other elements of a defamation claim. This appeal followed.

## II. DEFENDANTS' MOTIONS FOR SUMMARY DISPOSITION

Defendants argue that the trial court erred in denying their motions for summary disposition. Although the trial court did not clarify under which subsection of MCR 2.116(C) it considered defendants' motions for summary disposition, Kern cited MCR 2.116(C)(7) and (C)(10), while Boyer and Kort cited (C)(8) and (C)(10). "Because the trial court considered factual matters outside the four corners of the complaint, we will review whether summary disposition was appropriate under MCR 2.116(C)(10)." *Edwards v Detroit News, Inc*, 322 Mich App 1, 11; 910 NW2d 394 (2017). "This Court [] reviews de novo decisions on motions for summary disposition brought under MCR 2.116(C)(10)." *Pace v Edel-Harrelson*, 499 Mich 1, 5; 878 NW2d 784 (2016). A motion for summary disposition pursuant to MCR 2.116(C)(10) "tests the factual sufficiency of the complaint." *Joseph v Auto Club Ins Assoc*, 491 Mich 200, 206; 815 NW2d 412 (2012). "In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Summary disposition is proper where there is no "genuine issue regarding any material fact." *Id*. "A reviewing court may not employ a standard citing the mere possibility that the claim might be

supported by evidence produced at trial. A mere promise is insufficient under our court rules." *Bennett v Detroit Police Chief*, 274 Mich App 307, 317; 732 NW2d 164 (2006).

## A. THE FAIR-REPORTING PRIVILEGE

Defendants argue that their statements were protected by the fair-reporting privilege, and therefore, summary disposition was warranted. We disagree.

## 1. STANDARD OF REVIEW & APPLICABLE LAW

Questions involving statutory interpretation are reviewed de novo. *Ingham Co v Mich Co Rd Comm Self-Insurance Pool*, 321 Mich App 574, 579; 909 NW2d 533 (2017). Similarly, "[t]he existence of a privilege that immunizes a defendant from liability for [defamation] is a question of law that this Court determines de novo." *Northland Wheels Roller Skating Ctr, Inc v Detroit Free Press, Inc*, 213 Mich App 317, 324; 539 NW2d 774 (1995).

"A defamatory communication is one that tends to harm the reputation of a person so as to lower him in the estimation of the community or deter others from associating or dealing with him." *Lawrence v Burdi*, 314 Mich App 203, 214; 886 NW2d 748 (2016) (quotation marks omitted). In actions alleging defamation, a plaintiff "must plead . . . with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Sarkar v Doe*, 318 Mich App 156, 184; 897 NW2d 207 (2016) (quotation marks omitted). A claim for defamation requires proof of four elements:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Edwards*, 322 Mich App at 12, quoting *Lakin v Rund*, 318 Mich App 127, 133; 896 NW2d 76 (2016).]

However, "[n]ot all defamatory statements . . . are actionable." *Edwards*, 322 Mich App at 13. As one example, "[p]rivilege can be used as a defense in a defamation action." *Bedford v Witte*, 318 Mich App 60, 65; 896 NW2d 69 (2016). "The defense of privilege is grounded in public policy; in certain situations, the criticism uttered by the defendant is sufficiently important to justify protecting such criticism notwithstanding the harm done to the person at whom the criticism is directed." *Id*. The Legislature codified one such privilege at MCL 600.2911(3), which in relevant part states:

> Damages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding, or of a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report.

This statutory subsection is often referred to as "Michigan's statutory fair reporting privilege." See *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 131; 793 NW2d 533 (2010).

The Michigan Supreme Court recently restated the proper procedure for statutory interpretation:

> In interpreting [a statute], our goal is to give effect to the Legislature's intent, focusing first on the statute's plain language. In doing so, we examine the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme. When a statute's language is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. [*Ronnisch Constr Group v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016) (internal citations omitted).]

Therefore, we first turn the language of the fair reporting privilege to determine whether defendants are entitled to protection thereunder. See *id*. "In order for a report to be privileged under this statute, the report must be 'fair and true . . . .'" *Bedford*, 318 Mich App at 66, quoting MCL 600.2911(3). "In other words, the report must 'substantially represent' the public record or other pertinent matter." *Bedford*, 318 Mich App at 66. "Under this test, minor differences are deemed immaterial if the literal truth produces the same effect." *Northland Wheels*, 213 Mich App at 325. Stated differently, "[i]f any inaccuracy does not alter the effect the literal truth would have on the recipient of the information, the pertinent standard has been satisfied." *Bedford*, 318 Mich App at 66. In determining whether a statement is "substantially true," this Court has been directed to consider the "gist" or "sting" of the statements. *Northland Wheels*, 213 Mich App at 325. "The statute excepts from the privilege libels that are not a part of the public and official proceeding or governmental notice, written record or record generally available to the public." *Id*. at 71 (brackets omitted), quoting *Amway Corp v Procter & Gamble Co*, 346 F 3d 180, 187 (CA 6, 2003).

## 2. ANALYSIS

The trial court properly denied summary disposition to defendants because the fair-reporting privilege is inapplicable in the present case. The parties argue regarding whether the statements at issue were "fair and true" reports of the public record filings in the civil and criminal court cases against Punturo. Plaintiffs insist that the public record contained only accusations and unproven assertions of different crimes, whereas the statements made by defendants to the various news media outlets were statements of fact that such crimes were committed. Plaintiffs assert that the fair reporting privilege applies to statements tempered with qualifiers regarding the fact that criminal charges and civil complaints merely are allegations and not proven facts. Defendants went outside the privilege when stating that Punturo committed felony extortion and criminal violations of MARA. On the contrary, defendants argue that the "gist" or "sting" of the statements appropriately summarized the allegations made in the criminal charges and civil complaint, so were protected by the privilege. After all, defendants used declarative statements in their court pleadings, so their use thereof in statements to the media literally reflected the public record.

The trial court properly determined that MCL 600.2911(3) and this Court's interpretation thereof in *Bedford*, 318 Mich App at 71, were binding and determinative in the instant case. Therein, this Court reasoned that statements by a lawyer were not protected under the privilege when his "comments did not merely summarize what was alleged—but not yet adjudicated—in

the federal complaint," but instead expressed with certainty "that plaintiffs broke the law in various ways." *Id*. "Given the level of certainty expressed, we conclude that his words did alter the effect the literal truth would have on the recipient of the information, and thus the 'fair and true' standard in MCL 600.2911(3) was not satisfied." *Bedford*, 318 Mich App at 71.

In *Bedford*, this Court did not clarify exactly what words were used by the defendants to indicate that the plaintiffs committed crimes with certainty. However, the record is clear that defendants made statements, with certainty, that Punturo committed extortion and violations of MARA. For example, Kern said that Punturo "flagrantly violated state antitrust laws," and that his contract with Boyer "violate[d] [MARA] in of [sic] itself." Kern stated that "[t]here was extortion for the past two years." Kern also specified that, after reviewing the contract and communications between Punturo and Boyer, he "recognized extortion," and "realized it violated antitrust laws . . . ." Kern even clarified that he did not "know of any other antitrust case with such significant extortion." Kern also told the news media "[a]s soon as I saw the contract, I'm like, 'This is an antitrust violation, this is a covenant not to compete, this is extortion.' " There also were statements attributed to Kort and Boyer individually that amounted to objective statements that Punturo had committed a crime or violated state antitrust laws.

After reviewing those statements, the reasoning provided by this Court in *Bedford* is applicable to the present case, even if defendants never used the phrase "with certainty." The crux of the *Bedford* case was that the public record contains only unproven allegations, not that actual crimes were committed. Despite the content of the public record, defendants stated in no uncertain terms that Punturo committed extortion and flagrant violations of MARA. Therefore, as the panel in *Bedford* reasoned, "[g]iven the level of certainty expressed, we conclude that his words did alter the effect the literal truth would have on the recipient of the information, and thus the 'fair and true' standard in MCL 600.2911(3) was not satisfied." *Bedford*, 318 Mich App at 71.

Our previous decision in *Bedford*, 318 Mich App at 71, is binding and dispositive that the fair-reporting privilege was not applicable to the relevant statements at issue. Consequently, the trial court properly denied defendants' motions for summary disposition on that ground.

## B. PROTECTED SPEECH

Defendants argue that the trial court should have granted their motions for summary disposition as their speech was protected as opinion or rhetorical hyperbole. We disagree.

### 1. STANDARD OF REVIEW & APPLICABLE LAW

"Whether a statement is actually capable of defamatory meaning is a preliminary question of law for the court to decide." *Sarkar*, 318 Mich App at 179 (quotation marks omitted). "Where no such meaning is possible, summary disposition is appropriate." *Ireland v Edwards*, 230 Mich App 607, 619; 584 NW2d 632 (1998).

"To be considered defamatory, statements must assert facts that are 'provable as false.' " *Ghanam v Does*, 303 Mich App 522, 545; 845 NW2d 128 (2014), quoting *Milkovich v Lorain Journal Co*, 497 US 1, 19; 110 S Ct 2695; 111 L Ed 2d 1 (1990). For examples of statements that are not "provable as false" and thus protected by the First Amendment of the United States

Constitution, this Court has identified "expressions of opinion," "rhetorical hyperbole," and "imaginative expression often found in satires, parodies, and cartoons . . . ." *Hope-Jackson v Washington*, 311 Mich App 602, 621-622; 877 NW2d 736 (2015). More specifically, "[t]he First Amendment protects communications that 'cannot be reasonably interpreted as stating actual facts about the plaintiff,' i.e., 'expressions of opinion are protected.' " *Edwards*, 322 Mich App at 13, quoting *Ireland*, 230 Mich App at 614. However, "[e]ven statements couched in terms of opinion may often imply an assertion of objective fact and, thus, can be defamatory." *Ghanam*, 303 Mich App at 545. "As explained by the United States Supreme Court, the statement 'In my opinion Jones is a liar' may cause just as much damage to a person's reputation as the statement 'Jones is a liar.' " *Smith*, 487 Mich at 128, citing *Milkovich*, 497 US at 18-19.

Generally, "[a]ccusations of criminal activity are considered 'defamation per se' under the law and so do not require proof of damage to the plaintiff's reputation." *Ghanam*, 303 Mich App at 545. "However, not all statements that can be read as accusations of a crime or misconduct should be considered assertions of fact." *Id*. "Courts recognize that '[t]echnical inaccuracies in legal terminology employed by nonlawyers,' particularly when 'the popular sense of a term may not be technically accurate,' should not form the basis for recovery." *Hope-Jackson*, 311 Mich App at 623, quoting *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 264; 487 NW2d 205 (1992). "Terms such as 'blackmailer,' 'traitor,' 'crook,' 'steal,' and 'criminal activities' must be read in context to determine whether they are merely exaggerations of the type often used in public commentary." *Hope-Jackson*, 311 Mich App at 622, quoting *Ghanam*, 303 Mich App at 546, citing *Greenbelt Coop Publishing Ass'n, Inc v Bresler*, 398 US 6, 14; 90 S Ct 1537; 26 L Ed 2d 6 (1970). "If a reasonable reader would understand such words as merely 'rhetorical hyperbole' meant to express strong disapproval rather than an accusation of a crime or actual misconduct, they cannot be regarded as defamatory." *Hope-Jackson*, 311 Mich App at 623. "The context and forum in which statements appear also affect whether a reasonable reader would interpret the statements as asserting provable facts . . . ." *Sarkar*, 318 Mich App at 179 (quotation marks omitted). Ultimately, when considering if a statement is an opinion or rhetorical hyperbole that is not provable as false, "[t]he dispositive question . . . is whether a reasonable fact-finder could conclude that the statement implies a defamatory meaning." *Smith*, 487 Mich at 128.

## 2. ANALYSIS

The trial court properly denied defendants' motion for summary disposition on the grounds of speech protected as opinion or rhetorical hyperbole. Defendants first argue that their statements to the news media merely were expressions of their opinion, and therefore not provable as false. Kern made a multitude of statements that specifically and directly accused Punturo of violating MARA and committing extortion. Kern made sure to clarify that he discovered this malfeasance after reviewing the contract between Boyer and Punturo and the communications sent by Punturo to Boyer and Kort. The statements were not couched in opinion, and even if words suggesting personal opinions were used, they implied "an assertion of objective fact and, thus, can be defamatory." *Ghanam*, 303 Mich App at 545. In the simplest terms, based on Kern's words, a reasonable juror could conclude that Kern was stating that Punturo committed extortion and violated MARA as an objective fact, and therefore, "implie[d] a defamatory meaning," which is actionable. *Smith*, 487 Mich at 128.

Kern attempts to counter this evidence by asserting that the context of the statement reveals that he just was stating his subjective opinion. Kern reasons that because he was the attorney representing Boyer and Kort in their litigation against Punturo, any reasonable juror would know that he only subjectively believed his clients were correct that Punturo committed the alleged malfeasance. According to Kern, an average consumer of the news would not confuse his vigorous advocacy with assertion of objective fact. However, this Court previously has held that "an attorney is never justified in knowingly making false statements about an opposing party." *Ireland*, 230 Mich App at 615. To wit, in the *Ireland* case, this Court considered a defamation action against a lawyer that represented one parent in a custody dispute. *Id*. at 610. Due to a controversial ruling by the trial court, the case received media attention. *Id*. at 611. Over the course of several interviews with news media, the defendant attorney claimed, among other things, that the opposing parent had abused and neglected the subject child. *Id*. at 611-612. When the custody case ended, the opposing parent sued the defendant attorney for defamation. *Id*. at 612.

The defendant argued that her words were not capable of defamatory meaning because they merely expressed her subjective opinion or amounted to rhetorical hyperbole. *Id*. at 616-618. This Court agreed for certain statements, citing that the defendant attorney's statements that the opposing parent was "unfit" were a matter of opinion, while statements that the opposing parent "never spent a moment" with the child were rhetorical hyperbole. *Id*. at 617-619 & n 9. Consequently, those statements were not provable as false and thus not capable of defamatory meaning. *Id*. For the remaining statements, however, this Court determined that those were "at least potentially capable of defamatory meaning." *Id*. at 619. "The statements that suggested that [the opposing parent] abused her child are clearly defamatory, as is the statement that [the opposing parent] was a liar." *Id*. In sum, at least two of the statements made by the defendant attorney regarding the opposing party were capable of defamatory meaning. [3]

Here, Kern attempts to shield himself from liability by asserting that he just was advocating for his clients. However, the defendant attorney in *Ireland* was doing the same thing when accusing the opposing parent of neglect, abuse, and being a liar. The *Ireland* Court was not willing to call those statements "opinions" even given that the statements were made in the interest of advocacy. As stated, "an attorney is never justified in knowingly making false statements about an opposing party." *Id*. at 615. Thus, Kern's argument that his statements were protected as opinion and not provable as false is without merit. *Smith*, 487 Mich at 128; *Ireland*, 230 Mich App at 615.

---

[3] The panel in *Ireland*, 230 Mich App at 622-624, ultimately determined that even the potentially defamatory statements required summary disposition because there was no genuine issue of material fact that the defendant attorney did not act with actual malice. Proof of actual malice was required because the parties stipulated that the opposing parent was a limited-purpose public figure. *Id*. at 615 & n 5. As discussed, *infra*, no such stipulation exists in the present case and the parties have yet to litigate the issue.

Boyer and Kort also argue that the statements individually attributed to them were protected as expressions of opinion. A close reading of those statements by Boyer reveals that they were not expressions of opinion. Instead, the statements were made as objective facts. Boyer stated that Punturo threatened him, extorted him, and sought to put him out of business with allegedly illegal business tactics. Boyer's accusations are capable of defamatory meaning and were not protected as opinions because they were provable as false.[4] *Smith*, 487 Mich at 128.

Kort's sole statement expresses an objective fact that Kern discovered that Punturo committed violations of Michigan's anti-trust statute. While that very well may be a truthful assertion, our role is not to make that determination. Instead, the only issue before this Court is whether the statement was an assertion of opinion. Because the record shows it was not, and Punturo could prove the statement was false by showing he did not violate MARA, the statement is actionable. See *Ghanam*, 303 Mich App at 545.

Next, defendants argue that their statements amounted to rhetorical hyperbole and thus were not capable of defamatory meaning. Specifically, they allege that their use of the words "extortion" or "anti-trust" violations would not be taken as actual allegations of crimes committed. This Court and the United States Supreme Court have acknowledged that sometimes the use of words that correlate with specific crimes are not meant to be actual accusations of those crimes. *Greenbelt Coop*, 398 US at 14; *Hope-Jackson*, 311 Mich App at 622. However, "[l]anguage that accuses or strongly implies that someone is involved in illegal conduct crosses the line dividing strongly worded opinion from accusation of a crime." *Kevorkian v American Med Ass'n*, 237 Mich App 1, 8; 602 NW2d 233 (1999). The present case is the latter instead of the former because the statements of defendants specifically accused Punturo of committing extortion and criminal violations of MARA. See *id*.

While in some cases, using words like "anti-trust" and "extortion" might be written off as rhetorical hyperbole, they cannot be here for two reasons. First, as we previously have noted, the context of a statement matters when considering how a reasonable juror would interpret it. *Sarkar*, 318 Mich App at 179. In this case, the statements came after defendants filed a civil suit accusing Punturo of "flagrant violations" of MARA and reported those findings to the AG, and after the AG responded by filing felony extortion charges against Punturo. Thus, defendants' statements took place in an atmosphere where Punturo was literally being charged with one of the crimes defendants were accusing Punturo of committing—extortion. The context would urge the reader to look past the meaning of "extortion" in the common parlance, and instead assume that it was an accusation that a crime was committed. Similarly, defendants were not using "anti-trust" to suggest questionable business practices, but instead were specifically accusing Punturo of violating a Michigan statute. In several of the statements, Kern goes as far as identifying the name of the statute itself, citing MARA. Therefore, based on the context of the

---

[4] We express no opinion, considering the premature nature of the record, whether Boyer's statements actually were false. That issue has yet to be litigated and is not before us on appeal.

statements, a reasonable juror would likely consider the statements as accusations of a crime, not just rhetorical hyperbole. *Sarkar*, 318 Mich App at 179; *Kevorkian*, 237 Mich App at 8.

Second, with regard to Kern only, his reliance on protection for rhetorical hyperbole is entirely misplaced. The protection is provided because laypersons often use legal words in a manner that does not comport with the meaning of those words in a strictly legal sense. The example used by the United States Supreme Court was "blackmail." While the word may have a specific legal meaning, the general public uses it to describe many other situations, such as improper bargaining techniques, some of which may not be illegal. See *Greenbelt Coop*, 398 US at 14. Kern, however, is not a member of the general public. He is an attorney. Therefore, when he uses a specific legal term to describe a person's behavior, a reasonable juror would be well-supported in understanding that term as an accusation of a specific crime, not rhetorical hyperbole. To wit, this Court previously used the term "nonlawyer" when describing the protection afforded: "Courts recognize that '[t]echnical inaccuracies in legal terminology employed by nonlawyers,' particularly when 'the popular sense of a term may not be technically accurate,' should not form the basis for recovery." *Hope-Jackson*, 311 Mich App at 623, quoting *Rouch*, 440 Mich at 264. This is not the situation here and Kern's statements are not entitled to such protection.

The trial court properly denied defendants' motion for summary disposition on the grounds of speech protected as opinion or rhetorical hyperbole.

## C. VICARIOUS LIABILITY

Boyer and Kort argue that their motions for summary disposition should have been granted where they cannot be held vicariously liable for the torts of their lawyer, Kern. We disagree.

### 1. STANDARD OF REVIEW & APPLICABLE LAW

"When there is a disputed question of agency, if there is any testimony, either direct or inferential, tending to establish it, it becomes a question of fact . . . ." *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n/Mich Ed Ass'n*, 458 Mich 540, 556-557; 581 NW2d 707 (1998) (quotation marks omitted). Whether one party can be held vicariously liable for the actions of another is a question of law that this Court reviews de novo. See *Rogers v JB Hunt Transp, Inc*, 466 Mich 645, 650; 649 NW2d 23 (2002).

"An agent is a person having express or implied authority to represent or act on behalf of another person, who is called his principal." *Stephenson v Golden*, 279 Mich 710, 734; 276 NW 849 (1937) (quotation marks omitted). With respect to agencies, "we consider 'the relations of the parties as they in fact exist under their agreements or acts' and note that in its broadest sense agency 'includes every relation in which one person acts for or represents another by his authority.' " *St Clair Intermediate Sch Dist*, 458 Mich at 557, quoting *Saums v Parfet*, 270 Mich 165, 170-171; 258 NW 235 (1935). "[F]undamental to the existence of an agency relationship is the right to control the conduct of the agent . . . with respect to the matters entrusted to him." *St Clair Intermediate Sch Dist*, 458 Mich at 558 (citation omitted).

-11-

"In an agency relationship, it is the power or ability of the principal to control the agent that justifies the imposition of vicarious liability." *Laster v Henry Ford Health Sys*, 316 Mich App 726, 735; 892 NW2d 442 (2016). "A principal may be vicariously liable to a third party for harms inflicted by his or her agent even though the principal did not participate by act or omission in the agent's tort." *Bailey v Schaaf (On Remand)*, 304 Mich App 324, 347; 852 NW2d 180 (2014), vacated on other grounds 497 Mich 927 (2014). "Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of the other." *Al-Shimmari v Detroit Med Ctr*, 477 Mich 280, 294; 731 NW2d 29 (2007) (quotation marks omitted). "[V]icarious liability may [] attach through the concept of agency" irrespective of an employer-employee relationship. *Laster*, 316 Mich App at 735. "The principal is held to have done what the agent has done. The law contemplates that the agent's acts are the principal's acts and that the principal 'is constructively present at them all.' " *Nippa v Botsford Gen Hosp*, 257 Mich App 387, 391; 668 NW2d 628 (2003), quoting *Smith v Webster*, 23 Mich 298, 299-300 (1871).

"The legal relationship between attorneys and their clients is one example of an agency relationship." *Russell v Detroit*, 321 Mich App 628, 641; 909 NW2d 507 (2017). The principal's liability, however, is limited to "the torts of his agent committed in the scope of the agency." *St Paul Fire & Marine Ins Co v Ingall*, 228 Mich App 101, 109; 577 NW2d 188 (1998). "The authority of an agent to bind a principal may be either actual or apparent." *Alar v Mercy Mem Hosp*, 208 Mich App 518, 528; 529 NW2d 318 (1995). This Court previously has held a principal accountable for an intentional tort (fraud) of the principal's agent, so long as that tort was committed in the scope of the agency " 'even though the principal was ignorant thereof and the agent, in so doing, exceeded his authority or acted in violation of his principal's instructions.' " *Kuebler v Equitable Life Assurance Society of the US*, 219 Mich App 1, 8-9; 555 NW2d 496 (1996), quoting *Bleam v Sterling Ins Co*, 360 Mich 208, 213; 103 NW2d 466 (1960).

2. ANALYSIS

Questions of fact remain regarding whether Boyer and Kort can be held vicariously liable for Kern's allegedly defamatory statements. Boyer and Kort hired Kern to represent them in their litigation with Punturo. Kern, therefore, was an agent for Boyer and Kort, who acted as the principal. *Russell*, 321 Mich App at 641. Consequently, Kort and Boyer were liable for the torts committed by Kern so long as he performed the tortious conduct within the scope of the agency. *St Paul Fire & Marine Ins Co*, 228 Mich App at 109. In addressing the scope of the agency, this Court must consider "the relations of the parties as they in fact exist under their agreements or acts . . . ." *St Clair Intermediate Sch Dist*, 458 Mich at 557 (quotation marks omitted). The record, premature though it may be, shows that there is at least a question of fact regarding whether Kern's allegedly defamatory statements were made within the scope of the agency. Kern was hired to litigate Kort and Boyer's claims against Punturo, which included possible settlement negotiations. As alleged by Punturo, Kern sent at least one e-mail threatening that he and his clients would go to the news media with less than flattering information if Punturo refused to settle the civil case for a large sum of money. According to Punturo, Kern insinuated that the bad press from Kern, Boyer, and Kort would lead to negative consequences in Punturo's then pending criminal case. If that alleged purpose is true, Kern's statements undoubtedly would be considered within the scope of his agency. After all, a lawyer's agency certainly includes the

-12-

ability to negotiate desirable settlement terms. "When there is a disputed question of agency, if there is any testimony, either direct or inferential, tending to establish it, it becomes a question of fact . . . ." *Id*. at 556-557 (quotation marks omitted). Consequently, because there remained a question of fact regarding whether Kort and Boyer could be held vicariously liable for the allegedly defamatory statements of their agent/attorney, Kern, summary disposition properly was denied. *Id*.

Kort and Boyer counter that Kern's statements to the media were not within the scope of his agency because those statements violated MRPC 3.6, which in relevant part provides that attorneys involved in the "litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." Boyer and Kort's argument relies on the presupposition that a statement made in violation of MRPC 3.6 must necessarily fall outside of Kern's authority as their agent. Assuming, without deciding that Kern violated MRPC 3.6, Kort and Boyer's argument is without merit. As this Court previously has held, when an agent commits a tort within the scope of the agency, it is irrelevant that the "the principal was ignorant thereof and the agent, in so doing, exceeded his authority or acted in violation of his principal's instructions.' " *Kuebler*, 219 Mich App at 8-9 (quotation marks omitted). Thus, it is inconsequential that Kort and Boyer did not know that Kern intended to make defamatory statements or that the making of defamatory statements was outside the authority delegated to Kern as their agent. *Kuebler*, 219 Mich App at 8-9.

One hundred and forty-five years ago, our Supreme Court reasoned similarly in a case involving a client being sued for the tortious conduct of the client's attorney. *Foster v Wiley*, 27 Mich 244 (1873). The plaintiff in that case sued the defendant for "taking from his possession a certain carriage." *Id*. at 245. Previously, the defendant had obtained judgment against the plaintiff for possession of the carriage. *Id*. However, the plaintiff contended that the judgment had been wrongfully obtained and therefore provided no legal grounds for the repossession of the carriage. *Id*. at 245-246. "It [was] not claimed that [the defendant] personally directed the issue of execution, but it is conceded that it was ordered out by [defendant's attorney], into whose hands for collection [the defendant] had placed the demand upon which judgment had been recovered." *Id*. at 246. The Court considered "whether, where one places a demand in the hands of an attorney for collection, he is to be held as approving and adopting whatever is done by the attorney in respect to the demand for the ostensible purpose of collecting it . . . ." *Id*. The Court was especially concerned that, where the attorney repossessed the carriage without any authority of law, his actions amounted to a "naked tort." *Id*. at 247. The Court acknowledged the defendant's argument that the attorney "alone must be held responsible for the trespass which followed, unless affirmative evidence is given that the client was consenting to his action." *Id*.

The *Foster* Court recognized some authority suggesting that an attorney must be held individually responsible because the client, "in suing out an execution[, ] must be assumed to have intended a lawful exercise of authority by the officer, and not unlawful action." *Id*. at 248. After citing additional legal authority to the contrary, the Court provided the following analysis and conclusion:

> There is a plain difference between a trespass committed on a third party in assumed execution of process, and one committed on the [plaintiff] under process sued out irregularly. A [client] can never be held to intend a trespass to third persons; but when one puts his case against another into the hands of an attorney for suit, it is a reasonable presumption that the authority he intends to confer upon the attorney includes such action as the latter, in his superior knowledge of the law, may decide to be legal, proper and necessary in the prosecution of the demand, and consequently whatever adverse proceedings may be taken by the attorney are to be considered, so far as they affect the [plaintiff] in the suit, as approved by the client in advance, and therefore as his act, even though they prove to be unwarranted by the law. Such seems to be the result of the authorities. It follows that the circuit court erred in holding [the defendant] not liable. [*Id*. at 248-249.]

The reasoning of the Court in *Foster* is consistent with the agency principles here. The Court reasoned that when an attorney acts in the scope of the agency, the principal is liable for the torts committed by the attorney, even where such acts would be considered to be outside of the client's expectation that the attorney would only perform the duties in a lawful manner. *Id*. When an attorney's actions are within the scope of the agency, they are considered to be "approved by the client in advance, and therefore as his act, even though they prove to be unwarranted by the law." *Id*.

The application of *Foster* to this case is clear. Boyer and Kort retained Kern as their attorney, or agent, to litigate their issues with Punturo. The scope of Kern's agency included, "such action as [he], in his superior knowledge of the law, may decide to be legal, proper and necessary in the prosecution of the demand . . . ." *Id*. There is at least a question of fact that Kern considered his actions "legal, proper, and necessary" to achieve a beneficial settlement for Kort and Boyer. *Id*. It is irrelevant if those actions "prove to be unwarranted by the law," because Kort and Boyer, as the principals, are considered by the law to have performed the acts themselves. *Id*. "The principal is held to have done what the agent has done. The law contemplates that the agent's acts are the principal's acts and that the principal 'is constructively present at them all.'" *Nippa*, 257 Mich App at 391, quoting *Smith*, 23 Mich at 299-300. Consequently, any violation of the MRPC ultimately was irrelevant and summary disposition properly was denied.

### III. PLAINTIFFS' CROSS-MOTION FOR SUMMARY DISPOSITION

Plaintiffs argue that the trial court should have granted their cross-motion for summary disposition where there was no question of fact that defendant committed defamation per se. We disagree.

### A. STANDARD OF REVIEW

"This Court reviews de novo the grant or denial of a motion for summary disposition . . . ." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "If, after careful review of the evidence, it appears to the trial court that there is no genuine issue of material fact and the opposing party is entitled to judgment as a matter of law, then summary disposition is

properly granted under MCR 2.116(I)(2)." *Lockwood v Township of Ellington*, 323 Mich App 392, 401; ___ NW2d ___ (2018).

## B.  APPLICABLE LAW & ANALYSIS

As discussed, *supra*, a claim for defamation requires proof of four elements, one of which is "either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Ghanam*, 303 Mich App at 544, quoting *Smith*, 487 Mich at 113. "It has long been established that 'words charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal.' " *Lawrence*, 314 Mich App at 214, quoting *Burden v Elias Bros Big Boy Restaurants*, 240 Mich App 723, 727-728; 613 NW2d 378 (2000). "MCL 600.2911(1) is the codification of the common-law principle that words imputing a lack of chastity or the commission of a crime constitute defamation per se and are actionable even in the absence of an ability to prove actual or special damages . . . ." *Burden*, 240 Mich App at 728. "Where defamation per se has occurred, the person defamed is entitled to recover general damages in at least a nominal amount." *Id*.  In short, a claim of defamation per se fulfills the fourth element by excusing a plaintiff from proving special harm. *Ghanam*, 303 Mich App at 544.

A claim of defamation per se, however, does not necessarily satisfy the other three elements of a defamation claim, which include, "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher . . . ." *Edwards*, 322 Mich App at 12, quoting *Lakin*, 318 Mich App at 133. While plaintiffs contend that the other three elements are fulfilled as well, the record does not support that assertion. Even if plaintiffs had presented unrebutted evidence that the statements were false, defamatory, and communicated to a third party in an unprivileged manner, summary disposition still properly was denied. The parties have yet to litigate regarding or stipulate to Punturo's status here.  If the trial court were to find Punturo to be a limited-purpose public figure because of the media attention regarding Punturo's behavior in the Traverse City tourism industry, then Punturo would be required to prove actual malice. *Ghanam*, 303 Mich App at 544. While Punturo undoubtedly would argue that he was a private figure, the determination requires a review of "the nature and extent of the individual's participation in the controversy," because "[a] private person can become a limited-purpose public figure when he voluntarily injects himself or is drawn into a particular controversy and assumes a special prominence in the resolution of that public controversy." *New Franklin Enterprises v Sabo*, 192 Mich App 219, 222; 480 NW2d 326 (1991), citing *Wolston v Reader's Digest Ass'n, Inc*, 443 US 157, 166-167; 99 S Ct 2701; 61 L Ed 2d 450 (1979). The record is too limited to make such determinations at this time.

Furthermore, even if Punturo were to be considered a private person, there are heightened requirements for proof of falsity when the issue involved is one of public interest. *Locricchio v Evening News Ass'n*, 438 Mich 84, 113; 476 NW2d 112 (1991), citing *Philadelphia Newspapers, Inc v Hepps*, 475 US 767, 768-769; 106 S Ct 1558; 89 L Ed 2d 783 (1986). Given that the actual newspapers and all of the communications between the parties have not been produced at the trial court level, the questions of whether the issue was one of public interest and whether plaintiffs satisfied their burden to prove falsity, remain unanswered. Lastly, even if Punturo can

be considered a private individual, and the statements were made on a private matter, Punturo still would be required to prove negligence, the third element of a defamation claim. *Edwards*, 322 Mich App at 12. Given the limited record before this Court and the trial court, that is a question that cannot yet be answered. For example, when investigating the claims made against Punturo, the AG determined that he had probable cause to charge Punturo with felony extortion. Without reviewing the documents considered by the AG, it is not possible to determine whether defendants' statements were negligently made. Considering that defendants have yet to file a responsive pleading or conduct discovery of any kind, the record has not yet developed. After discovery, the trial court on summary disposition, or a jury during trial, will be required to consider whether defendants' statements that Punturo committed crimes was negligent, even if it ultimately was proven false. See *id*.

In sum, plaintiffs' cross-motion for summary disposition was properly denied where there still remained questions of law and fact to be resolved.

## IV. CONCLUSION

The trial court properly denied the motions and cross-motion for summary disposition on the grounds presented. We express no opinion regarding other potential defenses to plaintiffs' claims of defamation.

Affirmed.

/s/ Jane M. Beckering
/s/ Michael J. Riordan
/s/ Thomas C. Cameron